# Cincinnati, New Orleans & Texas Pacific Railway Co. v. Lovell's Admr.

(Decided December 14, 1910.)

## Appeal from Pulaski Circuit Court.

1. Railroads—Contributory Negligence.—Contributory negligence is a good defense to an action to recover damages for death caused by negligence or wrongful act, if it be of such character as that the death would not have occurred except for the contributory neglect.

2. Contributory Negligence—Violation of Rules.—If a railroad employe is injured by his violation of a reasonable rule of the company that is known or should be known to him, he cannot recover damages.

3. Rules.—Rules and regulations are necessary in the conduct of the business of railroading, and when reasonable and not against public policy they are looked upon with favor by the courts. But a railroad company will not be permitted to set up as a defense to an action brought by the representative of an employe to recover damages for his death a rule or custom promulgated or authorized by it that manifests a wanton or reckless disregard of his safety.

4. Rules—Construction of.—Generally, the construction of rules for the government of employes is for the court, but their application to the facts, if there is reasonable doubt about their applicability, is for the jury; and so if there is ground for reasonable difference of opinion as to whether the servant had or should have had notice cf the rule, or as to whether or not it was made and promulgated or was to whether or not it is in force then these issues of fact like any other are for the jury.

5. Rules—Application of.—A rule of the company providing that workmen under or about cars must display a blue flag by day and a blue light by night, is not applicable to the conductor of a yard freight crew, who has gone between the cars for the purpose of making temporary repairs so that a coupling might be made.

6. Rules—Custom.—A custom under which one yard crew was authorized to couple to a train standing in an adjacent yard under the charge of another yard crew, without giving any notice to the crew of the yard in which the train was standing that the coupling would be made, when the crew making the coupling knew or had reason to believe that members of the other crew might be working in or about the train, is so indefensible that the railroad company will not be permitted to rely on it as a defense to an action brought by the representative of one of the yard crew who was killed when the coupling was made.

7. Rules—Waiver of.—Where a rule, with the knowledge and acquiescence of the master or a superior employe whose duty it is to enforce the rules, is habitually disregarded, evidence of this fact is allowable to excuse the employe for its violation. And when an issue as to the waiver of rules is made by the evidence, the court should submit it to the jury.

8. Measure of Damages—Instructions.—An instruction telling the

jury that if they found for the plaintiff, then "you will find such a sum in damages as you may believe from the evidence will reasonably compensate the estate of the deceased for the destruction of his power to earn money", is proper.

9. Measure of Damages—Evidence.—To aid them in estimating the damages the jury may receive evidence concerning, and have the right to consider the habits, character, physical condition, earning capacity, and probable duration of life of the deceased.

10. Damages—The deceased was twenty-seven years of age, a strong, vigorous man, of good character and habits, and it cannot be said that the assessment of $15,000.00 in damages for the destruction of his life was so excessive as to indicate that the jury were influenced by passion or prejudice in awarding it.

11. Facts.—At Somerset there was a north yard and a south yard, and a yard crew in each. The foreman of the north yard crew was engaged in repairing a broken coupler, when the cars between which he was standing were coupled to by a train of cars that had come from the south yard into the north yard, the coupling being made without giving any notice of the fact that it would be made. Held, that the company was liable for the negligence of the foreman of the south yard crew in making the coupling under the circumstances.

JOHN GALVIN and O. H. WADDLE & SONS, for appellant.

ROBT. HARDING, E. V. PURYEAR, JAMES DENTON, ROBT. WADDLE and GREEN, VAN WINKLE & SCHOOLFIELD for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

Jeff. Lovell, an employe of the appellant company, was killed in its yard at Somerset, Kentucky, by being crushed between two cars. His administrator brought this action under the statute to recover damages for the destruction of his life. Upon a trial before a jury the damages were assessed at $15,000, and judgment accordingly rendered for this amount. In asking a reversal of the judgment, it is earnestly insisted that the peremptory instruction requested by the railway company should have been given. The disposition of this question, which is the principal one in the case, makes it necessary that we should state with some elaboration the evidence.

At Somerset the railway company had two yards, known as the north yard and the south yard, and in each there were a number of side tracks or switches. These yards were about a mile apart, and connected by the main line of the railway. In each of these yards it

had a switching crew, consisting of an engineer, fireman, two brakemen and a foreman. Jeff. Lovell was the foreman of the north yard, and Garfield Cruse was the foreman of the south yard, each having the full compliment of men. The duties of these respective yard crews were the same. To illustrate: When a freight train came in from the north, it would stop on the main track in the north yard, and the engine would be detached from the train and taken to the roundhouse, leaving the train to be handled and moved by the north yard crew, whose duty it was to take the train as speedily as practicable off of the main track and put it on one of the sidings in the yard, and then distribute the cars at such places in the yard as the destination of the cars required. In distributing the cars it often happened that it would be necessary to take them from one yard to the other, and so if cars in the north yard were to be transferred to the south yard, the north yard crew would take them to that yard—the same course of conduct being observed by the crew in the south yard.

On the occasion of the accident, a freight train going south came into the north yard on the main track about eight o'clock at night, and as soon thereafter as it could be done the engine was uncoupled and taken to the roundhouse, leaving the cars on the main track. When this train came in, Lovell, in the performance of his usual duties, took his engine out on the main track for the purpose of coupling to the north end of the train, the tender being in front, that is, next to the train to be coupled to. When the tender came within some two feet of the north end of the north car, the engine stopped, so that preparations might be made to make the coupling. At this time Lovell and his two brakemen were present, and it was discovered that the coupling on the north end of the north car was broken or in such a defective condition that it could not be coupled to the tender. Thereupon Lovell attempted with a brake rod or similar piece of iron to make a temporary connection that would enable the engine to move the cars, but he found that with the implement he had a coupling could not be made and that it would be necessary to get a chain, and so he directed one of his brakemen to get the chain. In obedience to this direction, the brakeman started to find a chain, leaving Lovell on the track between the tender and the car, and the other brakeman standing just outside the rails of the track. Within almost a moment

after the brakeman started for the chain, the train of cars between which and the tender Lovell was standing was moved some two or three feet, and in the movement he was caught between the car and the tender and instantly killed. The movement of the train was occasioned by a cut of cars coming from the south yard to the north yard on the main track, and that were coupled to the south end of Lovell's train. This cut of cars was under the control of Garfield Cruse, the foreman in charge of the south yard crew, and consisted of fifteen cars which were being pushed by the engine. Cruse was standing on the top of the front car of this train that was moving at a moderate rate of speed. When the car on which he was standing got within a short distance of the south end of the train that Lovell was preparing to move, he discovered the cars standing on the main track, and immediately signalled his engineer to stop, which he did, and as soon thereafter as it could be done, a coupling was made between the train in charge of Cruse and the cars of the other train.

Cruse testified that at the time and before he made the coupling he did not know that any person was between or about the cars standing on the main track to which his train was coupled. And further, that it was customary in moving cars from one yard to the other to couple to any cars found standing on the main track, and that in obedience to this custom he made the coupling mentioned. Lovell's brakeman, who was standing on the side of the track near the engine had a lantern in his hand, and Lovell also had a lantern, but it was in the middle of the track. There was a headlight on the end of the tender of Lovell's engine, as well as the ordinary headlight on the engine, and both of these headlights were burning. The headlight on the tender shone against the end of the box car standing a few feet from it, but there is some evidence that the rays extended three or four feet out on each side of this box car. But, Cruse did not see either the rays from the headlight or the lantern of the brakeman. Nor is it shown that he made any attempt to discover them. In fact, we may safely say from the evidence that when he came to these cars standing on the main track he at once, or, as soon as it could be done, coupled to them, without making any effort of any kind or character to discover whether or not any person was between the cars or about them.

With the facts immediately connected with the injury in the condition stated, the railway company bases its contention that the peremptory instruction should have been given upon the ground that Lovell should have protected by a signal or light of some kind the south end of the train he was preparing to move. In support of the proposition that it was Lovell's duty to protect the south end of the train, a rule of the railway company was introduced, reading as follows:

"A blue flag by day and a blue light by night, displayed at one end or both ends of an engine, car or train, indicates that workmen are under or about it. When thus protected, the engine, car or train must not be moved or coupled with any other train, car or engine. Workmen will display the blue signals, and the same workmen alone are authorized to remove them. Other cars must not be placed on the same track, so as to intercept the view of the blue signals, wthout first notifying the workmen."

It is conceded that Lovell did not protect the south end of his train with the blue signal referred to in this rule, or a signal or warning of any kind. And if this rule was applicable to Lovell, or if independent of any rule it was his duty under the circumstances to protect the south end of his train by a signal sufficient to have warned Cruse not to permit his train to move or disturb it, then Lovell's death was caused by his own negligence in failing to observe a rule of the railway company intended to protect him from injury, or in failing to take proper precautions for his safety, and consequently his personal representative could not successfully maintain an action to recover damages for his death. Alexander v. L. & N. R. Co., 83 Ky., 589; L. & N. R. Co. v. Scanlon, 22 Ky. Law Rep., 1400; Thompson on Negligence, section 5395; Shearman & Redfield on Negligence, section 207; note to Nolan v. N. Y., N. H., & H. R. R. Co., 43 L. R. A., 305. For, although it is provided in section 241 of the Constitution of the State, as well as in section 6 of the Kentucky Statutes, that:

"Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, then, in every such case, damages may be recovered for such death, from the corporations and persons so causing the same.   *   *   *"

It has yet been held in a number of cases that contributory negligence is a good defense to an action to re-

cover damages for death caused by negligent or wrongful act if it be of such a character as that the death would not have occurred except for the contributory neglect. Clarke v. L. & N. R. Co., 101 Ky., 341; C., N. O. & T. P. Ry. Co. v. Yocum's Admr, 137 Ky., 117.

It will be observed that the rule on its face refers to "workmen" who are engaged under or about a car or standing train, and it is, therefore, argued for appellee that this rule did not apply to and was not designed to embrace trainmen engaged in an effort to make an emergency coupling, but it was intended to be applicable to workmen engaged in the business, whether temporarily or not, of repairing a car. This argument is forcefully supported by the uncontradicted evidence of the yardmasters and other employes at Somerset that it was never the custom or practice in the yards at Somerset for yard crews in moving cars or trains to use a blue light or a signal of any kind to protect the cars or train, although they might be, as Lovell was, delayed for a few minutes by an emergency such as he encountered; and by the further uncontradicted fact that the yard crews had never been supplied with the signals referred to in this rule, or any signals except the ordinary white lantern used by trainmen. From this evidence. read in connection with the rule referred to, the jury was fully warranted in concluding that it did not and was not intended to apply to Lovell, as he was not in the effort to make the coupling a "workman" within its meaning. This rule, and a bulletin posted in the yard office, reading:

"All Conductors:

"The practice of leaving cars standing on main tracks in yards or elsewhere must not be countenanced.

"When by reason of an accident or other emergency it is necessary, such cuts of cars must be protected in yard limits by proper signals, and every precaution taken to avoid accident."

Are the only rules or regulations established by the company that it is claimed have any relation to the matter we are now considering. That this bulletin was not intended to apply to Lovell is, we think, apparent, from the evidence of Higgins, who was yardmaster at Somerset in February, 1907, and who testified that this bulletin was issued by the superintendent at his instance, and as he states "on account of what I regarded as

being the negligent practice of leaving cars standing on the main line." According to its terms, it had reference to "leaving cars standing on the main tracks in yards or elsewhere," and evidently contemplated a condition arising when a train or a car was left standing without any person being at the time engaged in an attempt to move it, and so we think the trial court correctly excluded it as evidence.

But the argument is further made that even if this rule and bulletin did not apply to Lovell, that he knew trains or cars from the south yard were likely at any time to be moved to the north yard upon the main track, and, therefore, he should have adopted some method of protecting the south end of his train, so that if the south yard crew found it necessary to move any cars to the north yard they would observe the signal and not disturb without sufficient notice or warning his train. And it is said that if he had no blue signal, he could have protected the south end of his train by a red light or by stationing there a brakeman with a white light, and that his failure to do this was fatal to a recovery, especially in view of the evidence before mentioned that it was customary for yard crews in going from one yard to the other to couple to cars standing on the main track without any notice or warning. Keeping in mind the uncontradicted evidence that it was not usual or customary for yard crews when engaged as Lovell was to protect their trains, and that there was no rule requiring it to be done, let us now see if Lovell, who we will presume knew that the south yard crew might at any time come with a cut of cars into the north yard, voluntarily put himself in a place of danger that excuses the company for his death, by his failure to protect the south end of his train. If he did, then it must be because of the custom or practice that had grown up in the yard of making couplings to cars or trains standing on the main track without giving any notice or warning that a coupling would be made. And it is this custom that the railroad company asserts as one of the chief reasons why a verdict in its favor should have been directed. The evidence of Garfield Cruse states very fully and clearly the practice under this custom, and so we will let him tell about it.

"Q. You have stated in your original examination that it was your duty to deliver cars from your yard to the main line in the north yard, and if you found the

main line occupied to couple on to the cars standing on the main line, have you not?"

"A. Yes, sir."

"Q. Now, that was only a custom, was it not, in that yard?"

"A. Yes, sir, it is a custom."

"Q. You knew that it was Lovell's duty to distribute those cars standing on the main line, did you not?"

"A. Yes, sir."

"Q. You knew that Lovell and his crew were likely to be around on or about those cars at that time, did you not?"

"A. Yes, sir."

"Q. You had no information as to when Lovell and his crew expected to move those cars from the main line?"

"A. No, sir."

"Q. And when you delivered the cut of cars from the south yard to the north you didn't know and made no investigations · to see whether or not Lovell or his crew were busy handling that cut of cars?"

"A. No, sir."

"Q. Did you give any warning, or had your engineer given any warning to Lovell and the north yard crew, that you were to couple on to the cut of cars which were standing on the main line?"

"A. No, sir."

"* * * * * * *"

"Q. You knew it was Lovell's duty to remove that cut of cars from the main line and distribute them on the side tracks?"

"A. Yes, sir."

"Q. It was necessary, then, in order for Lovell and his crew to remove those cars from the main line, to either couple on to the south end or the north of the cut?"

"A. Yes, sir."

"Q. You knew when you approached this cut of cars that Lovell and his engineer or crew was not at the south end of the cut?"

"A. Yes, sir."

"* * * * * * *"

"Q. Then as I understand you, it was customary and required by the company, that you as a foreman of one crew, should deliver cars into the hands of another

crew and make couplings without reference to the location of that crew?"

"A. Yes, sir."

"Q. What provision was made by the company for the protection of those employed, under those circumstances?"

"A. There wasn't any that I know of, I do not know of any."

It is manifest from this evidence that if there was a custom of this kind, it was a reckless and dangerous—if not inhuman—one. It placed yard crews at all times in danger from sources they could not in the ordinary conduct of the business well guard against and left them to be killed or crippled without any opportunity to escape unless every time one of them went between the cars for any purpose another was on the lookout to protect the cars he went between from being moved by a train in charge of the other crew. For example, suppose the coupler had not been defective, and that Lovell in the ordinary course of his duties had stepped in between the tender and the car to make the usual coupling, and just at the moment he was so engaged the south end of his train had been hit by the cars in charge of Cruse, could it be contended for a moment in the absence of a rule requiring Lovell in making an ordinary coupling to put out signals at the south end of his train, that his failure to do so would be negligence? We think not, and the mere fact that Lovell was engaged for a few minutes in attempting to arrange the coupling does not change our view of the situation or make this custom less obnoxious. And so, we will set aside as indefensible the proposition that Cruse according to a custom of the yard had the right to move a train of cars standing on the main track in the north yard, without taking any precautions whatever to ascertain whether or not any member of the north yard crew was engaged in making a coupling or in other necessary work in or about these cars. The railroad company will not be permitted to shelter itself under a custom that involves a reckless disregard of human life. When Garfield Cruse saw the train of cars standing on the main line in the north yard track, he knew it had been left there for the purpose of being moved by the north yard crew, and that they were probably at that very time engaged about it. Having this knowledge, he was and should be charged with the

duty of taking some means to inform himself whether or not any of that crew were occupied about this cut of cars before he undertook to move it, or at least the duty of giving timely and reasonably sufficient warning that he intended to move it.

We are, therefore, of the opinion that there was ample evidence to take the case to the jury and that they had the right to find under the instruction submitting this issue that the death of Lovell was brought about by the negligence of Cruse in moving Lovell's train without making any effort to ascertain whether or not any member of the north yard crew was engaged in or about the train that he contemplated moving. Lovell was not negligent. He was engaged in the performance of his duty, and while so engaged it was the duty of the company to see to it that he should not be wantonly killed under authority of a custom allowed by the company to be practiced by its employes without any reason to support it. The business in which railroad operatives are engaged is extremely hazardous, even when the utmost care is observed, and the railway company will not be permitted under the facts of this case to set up as a complete defense to an action brought to recover damages for the death of an employe, a practice or custom permitted or authorized by it, that manifests a wanton and reckless disregard of his safety. Rules and regulations are necessary in the conduct of the business of railroading, and when reasonable and not against public policy they should be and are looked upon with favor by the courts. C. & O. Ry. Co. v. Barns. 132 Ky., 728. But a rule or custom that endangers life and puts in peril the safety of employes or others, cannot receive our approval. L. & N. R. Co. v. Herndon, 126 Ky., 589.

The cases of L. & N. R. Co. v. Lumpkin, 136 Ky., 290, and Russell v. L. & N. R. Co., 124 S. W., 841, are relied on, but the facts of these cases are so radically different from the facts of this one that they are not authority for the position taken by counsel.

It is further insisted that the court especially erred in leaving it to the jury to say whether or not the written rule relied on by the company applied to Lovell, and in ruling generally upon the rules offered in evidence. Without attempting to set down principles applicable to every case in which the question of rules comes up, we may say that generally if a railroad company or

other master has established and promulgated written or printed rules for the government of employes, their construction is for the court; but their application to the facts, if there is reasonable doubt about their applicability, is for the jury. Again, if a written or printed rule is reasonable and not against public policy, and it is known to the employe or servant, or should be known by him and the undisputed facts show it was established and in force and that it is applicable to him and that his violation of it was the proximate cause of the injury he complains of, then the court should take the case from the jury. Western Union Telegraph Co. v. Crider, 107 Ky., 600. If, however, there is ground for reasonable difference of opinion as to whether it applies to the facts developed by the evidence, or as to whether the servant had or should have notice of it, or as to whether it has been made and promulgated; or as to whether it was in force, then these issues of fact, like any other, are for the jury, and they should be instructed accordingly. Elliott on Railroads, Vol. 1, Sec. 202; Illinois Central R. Co. v. Whittemore, 43 Ill., 420, 92 Am. Dec., 138; Pittsburg Ry. Co. v. Lynn, 123 Pa., 140, 10 Am. St. Rep., 517; South Florida R. Co. v. Rhoads, 3 L. R. A., 733. In this case, there was good reason to doubt whether or not the written rule invoked by the company applied to Lovell and so the court properly left this question to the jury in an instruction telling them in substance that if they believed from the evidence that Lovell was guilty of negligence in going between the engine and car without displaying signals at the south end of the train as required by the rules of the company, and that but for such negligence he would not have been injured, they should find for the railroad company. Supplementary to the foregoing statement of the law it should be said that it is also well established that although a rule may be applicable to the injured party, and of such a nature that if in force as to him it would defeat a recovery, he may yet avoid its operation and effect by evidence that with the knowledge or acquiescence of the master or a superior employe whose duty it was to enforce the rule, it was habitually disregarded; and when an issue of this character is made by the evidence the court should submit it to the jury. Labett on Master and Servant, Vol. 1, section 232; L. & N. R. Co. v. Foley, 94 Ky., 220; L. & N. R. Co. v. Bocock, 107 Ky., 223; note to Nolan v. N. Y., N. H. & H. R. R. Co., 43 L. R. A., 305. And so

the trial court correctly submitted this question to the jury in an instruction telling them that although they believed the rule was intended to apply to employes performing the service Lovell was, yet if they further believed that this rule with the assent of the company and the officers superior in authority to Lovell was habitually violated, and Lovell was expected by his superior officers to make couplings without protecting himself by signals, the company could not rely upon the rule to defeat a recovery. The other instructions, except the one relating to the measure of damages, are not complained of. The instruction on the measure of damages was as follows:

"If your finding be for the plaintiff, then you will find such a sum in damages as you may believe from the evidence will reasonably compensate the estate of Jeff. Lovell, deceased, for the destruction of his power to earn money, not exceeding however the amount of thirty thousand dollars, the sum claimed in the petition."

This instruction has been so frequently and uniformly approved that it does not seem necessary that we should extend this opinion in an effort to sustain it. But, in response to the argument against it submitted by counsel for appellant we may say this: In estimating compensatory damages in cases like this, the jury may receive evidence concerning and have the right to consider the habits, character, physical condition, earning capacity and probable duration of life of the deceased. They are allowed to have this data before them so that they may approximately at least fix the recovery at such a sum as will compensate the estate of the deceased for the destruction of his power to earn money. The loss to his estate is the amount that he will probably make and save if he should live the full limit of his expectancy of life. It would be unjust to the estate of the deceased if this loss was estimated on the theory that he would not increase his earning capacity, or that he would not make or save more than he was making or saving at the time of his death. It is of course probable that had Lovell lived to be an old man, his earning capacity would not have increased, and that his estate would be worth but little when he died; but, it is equally, if not more, probable that a young man of his habits and character would increase his earning capacity each year for many years, and in the end have an estate much larger than the amount awarded by the jury. Of course, how long

a person will live, or how much he will earn, or how much he will save, or how much he will leave at his death, are in the very necessity of things unknown problems. No human being can tell how long any person will live, and consequently no person can say how much his estate from a pecuniary standpoint will lose by his death. But, in compensating the estate of a person who has been killed by negligence for the destruction of his power to earn money it is more just and reasonable to assume that he will live the allotted time and that he will observe habits of thrift and industry than to assume that he will be stricken with disease or become idle and worthless or die many years before his expectancy of life has ended. And so it is that in dealing with the wrong-doer, the law requires him to give the injured person or his estate such a sum as under the most favorable conditions will compensate him or his estate for the loss occasioned by his wrongful act. In some jurisdictions the courts have thought it fair and just that in considering the loss the estate of the deceased has suffered by his death the jury should be directed to take into consideration what he would necessarily or probably expend, as well as what he might earn, and then to deduct one from the other, awarding such a sum as would amount to the difference between the gain and the expense. But we have never thought that it would be advisable or helpful to the jury to instruct them as to items of earning and expense, or to direct them specifically to consider one or the other. The fact is that our rule is as just to the parties as the one that obtains in jurisdictions where an instruction calling the attention of the jury in detail to the things they should take into consideration in assessing the damages is authorized. Under neither rule can the sum that should be awarded be ascertained with reasonable certainty. When the jury has before it all the evidence that either party desires to introduce, relating to the health, habits, earning capacity, character and probable duration of life of the deceased, and are then directed to assess the damages at such a sum as will compensate his estate for the destruction of his power to earn money, they have before them every fact upon which an estimate of the loss sustained can be based, and it is to be presumed that in making up their verdict the jury will take into consideration all of the facts indicated. Stewart v. L. & N. R. R. 136 Ky. 717, Netter v. Louisville City Ry. 134 Ky. 678.

It is complained that the verdict is excessive. It is true the amount of damages assessed is unusually large, and yet we cannot say that as compensation it is so excessive as to indicate that the jury were influenced by passion or prejudice in awarding it. Lovell was about twenty-seven years of age, a strong, vigorous man, of good character and habits, who had before him in the ordinary course of events a long and useful life. He was sober, industrious and economical and who can say that if he had lived his expectancy of life that his estate would not be worth as much as the amount allowed for its destruction? True, he was engaged in a hazardous business, but it does not follow from this that he must or would continue in this dangerous business all of his life, nor is it fair to assume that his salary would remain the same as he was receiving at the time of his death. He had already been promoted in the service of the company and it is likely that he would have received other promotions, each bringing with it increased compensation.

A few other alleged errors are pointed out in brief for the appellant, but we have not deemed them of sufficient importance to discuss them.

Upon the whole case we are of the opinion that the appellant had a fair trial, and so the judgment is affirmed.

The whole court sitting.