## Louisville & Nashville Railroad Company v. Moran.

(Decided May 16, 1912.)

### Appeal from Barren Circuit Court.

1. Master and Servant—Action for Injury Received in Sister State. —Where a servant sues a master in the courts of this State for an injury received in another State, the rights and liabilities of the parties are controlled by the laws of the State where the injury occurred.

2. Master and Servant—Fellow Servants.—Under the laws of Tennessee the engineer and fireman on a train are fellow servants, and neither can recover from the master for injuries received as a result of the negligence of the other.

3. Master and Servant—Rules for Government of Employes—Penalty for Disobedience.—An employe who is injured as a result of his disobedience of a reasonable rule promulgated by the master for the government of his employes, cannot succeed in a suit against the master to recover damages for the injuries received.

SIMS & RODES, BENJ. D. WARFIELD for appellant.

B. F. PROCTOR,· HAZELRIGG & HAZELRIGG for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellee, Moran, was the fireman, and W. F. Porter, the engineer, on a railroad engine that went through an open draw-bridge—that had been opened for the purpose of permitting a steamboat to pass through. The engineer, Porter, was killed, and Moran, the fireman, seriously injured. To recover damages for the injuries sustained Moran brought this action against the appellant company and upon a trial before a jury was awarded $4,000.

As the accident happened in the State of Tennessee, the rights of the plaintiff and the liability of the company are to be determined by the laws of that State. L. & N. R. Co. v. Smith, 135 Ky., 462. Under the laws of Tennessee, the engineer and fireman are fellow servants, and no recovery can be had by one on account of injuries sustained by the negligence of the other. L. & N. R. Co. v. Keiffer, 132 Ky., 419. This being so, the appellee rested his right to recover upon the negligence of the bridge tenders who had charge of the draw-bridge that was open at the time the injury complained of occurred, although an unsuccessful effort was made to show negligence on the part of the conductor of the train.

We may, therefore, say, at the very outset, that whether or not appellee was entitled to recover damages depends entirely upon the question whether or not the bridge tenders were negligent in the performance of their duties, for, if they were not negligent, the appellee failed to make out a case to go to the jury. Perceiving that this was the real question in the case, practically all of the evidence introduced in behalf of the appellee was directed by his counsel to establishing the negligence of these bridge tenders in two respects, first, in failing to give proper signals to the engineer that the draw-bridge was open, and second, in opening it when they knew it

was not necessary that it should be open and also knew that the train was due.

On the other hand, counsel for the railroad company predicated their defense upon the proposition that the accident was due solely to the negligence of the engineer. It is true there is some attempt to show that appellee, Moran, was guilty of negligence, but we do not think it necessary to take any time upon this issue as there is no evidence of his negligence in the record.

If the injuries sustained by appellee were the result solely of the negligence of the engineer, he can not recover; but if they were the result solely of the negligence of the bridge tenders, or the concurring negligence of the engineer and the bridge tenders, he can recover. But, as the issue is sharply made as to whether the accident was due solely to the negligence of the engineer or solely to the negligence of the bridge tenders, we may state that the decisive question in the case is—was the accident due to the negligence of the engineer or the negligence of the bridge tenders?

The train to which the accident occurred was a passenger train coming north on its way from Paris, Tennessee, to Bowling Green, Kentucky, and consisted of an engine and five passenger coaches. The engine and two of the coaches went through the open bridge, while the other coaches remained standing on the track. The accident happened about eight o'clock in the evening, in September, 1906; and at the time, the train was a few minutes behind its regular schedule time. The bridge which spans Cumberland river is 675 feet long, the draw span being in the center of the river, with a stationary span on each end of the draw span. The stationary span on the south side of the river, from which the train was approaching, is 215 feet long, and there is a trestle extending south from this stationary span 2,200 feet. On the trestle and 329 feet from the south end of the draw span and 114 feet from the south end of the stationary span, there is a stop board with the word "stop" on it.

The rules of the company, and which were put in evidence by appellee, regulating the movement of trains at this bridge, provide that:

"Enginemen will at all times when approaching draw bridges give four short blasts of the whistle when opposite the signal post situated one-half mile from

each draw bridge. A danger signal is displayed in the center of each draw span, inside the span, at all times, except when removed for passage of trains. A safety signal, as provided in rule 60, indicates that draw is improper position for passage of trains. Enginemen of all trains must approach all draw bridges with their trains under full control, and must not pass the signal post erected at each draw bridge until the danger signal is removed and the safety signal displayed, which must be done in their view. In case of failure to display these signals, as herein directed, enginemen must be governed by rule 65, and must know that the draw-bridge is in proper position before proceeding. Trains must not exceed a speed of six miles per hour in passing draw bridges. Draw tenders must display the proper signals as provided in the foregoing rules and must not attempt to change signals from danger to safety until they know that enginemen can plainly see the change made.''

It is also shown by the evidence of appellee that a white light raised and lowered vertically is a safety signal, or a signal to move ahead; or, as said in rule 60: ''A lamp raised and lowered vertically is a signal to move ahead.'' Another rule provides that:

''A signal imperfectly displayed, or the absence of a signal where a signal is usually shown, must be regarded as a danger signal.''

The rules also provide that a red light at night signifies danger, and means that the train must come to a stop.

The rules governing the opening of draw-bridges to permit the passage of boats are prescribed by the United States Government, and these rules among other things, provide that:

''Whenever a steamboat approaches any draw-bridge, and desires to pass through the draw thereof, the officer or person in charge of said steamboat shall cause to be sounded when said boat is within twenty minutes run of the bridge four distinct blasts of the steam whistle, and shall repeat the same at intervals of five minutes until it is seen from the boat that the signal is understood on the bridge and that the bridge is being opened. Upon hearing the signal prescribed, the tenders or operators of the draw-bridge shall at once open the draw spans of the bridge for the prompt passage of said steamboat, provided; that the draw may not be opened

when there is a train, wagon or vehicle at the time passing over said draw span, or a train approaching so closely that it can not be safely stopped before reaching the bridge.''

The appellee in his own behalf testified that Porter, the engineer, after he came on the trestle, sounded four blasts of the whistle, calling for a signal from the bridge tenders, and in a moment afterwards sounded two short blasts, indicating that he had received the safety signal from the tenders. That when he called for the signal, the bridge tender picked up the red light, and the engineer released the brake, which he had put in service application shortly before giving the four blasts, the effect of which was to increase the speed of the train. That in a moment afterwards the emergency brakes were applied, and he then saw that the draw bridge was open, and jumped or attempted to jump from the engine. He was asked these questions:

''Q. Now, what signal did the bridge tender give to Porter that caused him to give the two short blasts? A. He picked up the red lantern, red light. Q. Was that bridge safe at that time? A. No, sir. Q. When he picked up that red light, what did that indicate to Porter? A. Indicated safety. Q. Did Porter have his brake applied at the time he picked up the red light? A. Yes, sir. Q. If Mr. Porter had not released the brake when that red light was picked up, how far would his train have gone, with the air pressure he had on it, before it would have stopped? A. I don't think the train would have passed the stop board. Q. How many red lights did you see on that bridge? A. Saw one. Q. Where was that red light according to your judgment when you first saw it? A. In the middle of the draw. Q. When he picked up that red light, what did he do with it? A. He picked it up in his hand, and I moved down in the deck; I don't know what he did with it. Q. Did you see any lights about this bridge, or lamps or signals anywhere except the red light that the bridge tender had? A. No, sir. Q. What signal was it customary to give after he picked up the red light, provided the track was safe? A. Give a signal with a white light—white signifies safety.''

On his cross-examination, he said:

''Q. How is that white safety signal given, which you spoke of a while ago? A. It is given by the bridge

watchman. Q. How? A. By raising and lowering. Q. A white light or lantern? A. Yes, sir. Q. Vertically raising and lowering a white lantern? A. Yes, sir; that means, come ahead. Q. You never saw any signal but the red light? A. That is all. Q. Only the one? A. Yes, sir.''

Morris, the baggageman on the train, was asked these questions:

''Q. You say that a red flag or lamp is used for the purpose of stopping trains; if it was desired at that time to cause that train to stop or proceed, what was the proper plan if they wanted that train to stop? A. He should have a stationary red light and used the stop signal with the white. Q. What would it indicate at that time to an engineer approaching a station where a red lamp was stationed to remove the lamp? A. It would indicate that everything was safe for him to proceed when the red lamp was removed.''

On his cross-examination, he was asked:

''Q. What is the proper signal given at night to proceed over that bridge? A. I know that they always went out, and the bridge flagman would pick up the red light, and signed the engineer ahead, if everything was all right, waived for him to proceed. Q. Well, how? A. Well, he would simply pick up the red light and flag him ahead with the white light. Q. Flag him ahead with what? A. A white lamp. Q. If a man hasn't gotten the white light, and has a red lamp in his hand at that time, is that a signal of danger? A. Yes, sir. Q. If the man stands in the tracks with a red lamp in his hand, is it a danger signal? A. A red lamp always signifies danger. Q. If he waives it across his body that way, or across the track, what is it? A. Danger. Q. If it is stationary in the track, what is it. A. Danger.''

The conductor on the train, introduced as a witness for appellee, was asked:

''What was the duty of that bridge watchman there if he wanted that train to stop; should he have moved that red light at all? A. No, sir. Q. He ought to have left it on the track, even if the train ran over it? A. That is what I would have done; it is a danger signal either way. Q. You do know that red light is there all the time on that span? A. Yes, sir. Q. When and under what circumstances should he remove that red light? A. He removes it when the draw is all right. Q.

He first removes the red light and then gives the signal with a white light. A. That is right.''

On his cross-examination, he was asked:

''Q. When you said it was the bridge tenders' duty to let the red light stay in the middle of the track on the bridge, did you mean that it would be improper for him to pick it up? A. No, sir; I did not mean it would be improper. Q. If he did do such a thing as that, state whether or not it would still be a danger signal? A. It would still be a danger signal, no matter what position it was in. Q. You said that the bridge watchman, if he wanted Porter to come on with your train, should have first removed the red light, and then have given the signal you have mentioned with the white light? A. That is right. Q. Now, state what was the duty of your engineer to do—to wait for that white light signal before approaching the bridge? A. Yes, sir. Q. Was it his duty to wait until he did get the white light signal? A. Yes, sir.''

Mrs. Hoge was introduced in behalf of appellee and said that she was near the bridge and saw the train approaching. She said in substance that she saw the bridge man standing on the south stationary span of the bridge, waiving a red light; that she did not see the light until he picked it up and commenced waiving it, at which time the train was right close.

J. R. Manning, a witness for the appellee, and who lived close to the bridge, testified that:

''The bridge watchman, when he blew for the signal, was sitting on the right side of the track with his white light in his left hand. He reached to the red light picked up the red light, and then set the white light down on the right side of the track. He either walked rapidly or ran about, I should judge, six or seven paces towards the engine, and began to waive the red light back and forth. He remained in that position until the train had gotten within a few feet of him; he then stepped aside on the engineer's side, and ran back probably the length of one car, I suppose to get out of danger of the train going over him. Q. When this man on the bridge set down the white light, did he move that white light any more or did that remain there? A. I think it remained there. Q. When he started back meeting the train with the red light, did he have it in his hand? A. No,

sir. Q. I mean, did he have a red light in his hand? A. Yes, sir, a red light in his hand. Q. Did he leave the white light back? A. Yes, sir. Q. How far was the engine from him when he picked up the red light and started towards it? A. Well, he might have been 75 feet, I don't know exactly; the engine was on the fixed span of the bridge when he picked up the red light.''

Ross, one of the bridge tenders, testified that he was on the draw span, in the engine room, which is situated in the middle of the draw span, and was engaged in opening the draw span for the purpose of letting a boat go through that had given the blasts of its whistle indicating that it was calling for the draw. Asked—

"When it whistled, what did you begin to do? A. When it whistled I started out to the draw to put the red lights out; when the red lights were out, I went in the engine room to open the draw.''

While he was in the engine room, he saw the engine and cars go through the open draw. On his cross-examination he said that he knew the train was behind time a few minutes, and that when he started to the engine room, Ingram, the other bridge tender, was going to put a red light on the north end of the stationary south span. That there was at the time a red light in the middle of the draw span. That there were three red lights put out—one on the south end of the north stationary span, one in the center of the draw span, and one on the north end of the stationary south span. He also testified that they had a white light there for the purpose of giving signals with, and that Ingram took the white light with him when he went over to the south stationary span. He also testified it would take about seven or eight minutes to open and close the draw-bridge.

W. C. Ingram, the other bridge tender, said that when the steamboat blew for the draw-bridge, that Ross went up to start the engine to open the draw-bridge, and he went out to set the signals; that he first set the signal, which was a red lantern on the south end of the north stationary span, and then placed another red lamp in the center of the draw span, and then went to the north end of the south span and placed another red lantern. That when he had done this, Ross asked him if the signals were all right, and upon his answering that they were, Ross commenced to open the draw, and he stepped on to the stationary south span. That about the time he

stepped on the stationary south span, he heard the train whistle for the station, and also blow four short blasts of the whistle, which was the signal for the draw-tender, and in quick succession answered, by two short blasts, and come right on by the stop board, and on to the stationary south span. That when he was about half-way across the south span, running towards the open draw, he picked up the red light, and swung it backwards and forwards across the track, but the approaching train did not stop. He further testified that he did not give any signal with a white light.

This is the substance of all of the material evidence relating to the acts and conduct of the bridge tenders and the engineer. It appears from this evidence that the engineer gave four short blasts of the whistle at the usual place as he approached the bridge, and soon afterwards gave two short blasts, indicating that he had received a signal to proceed. But there is no evidence, nor is there any fact or circumstance from which it can be reasonably inferred, that the engineer ever received a safety signal or a signal to proceed, or that the bridge was safe. The only witness who testified to any movement of the white light by the bridge tender, said in effect that the bridge tender had a white light in his hand as the train was approaching, and set it down on the track and picked up a red light, which he waived across the track. Before the bridge tender picked up the red light, it was in plain view of the engineer. The fireman and other witnesses saw it, and the engineer could not have failed to see it if he was keeping a lookout. It was an imperative sign of danger, and an imperative signal to stop—especially was this true at this dangerous place. The bridge tender was not negligent in having a white light in his hand, as it was necessary that he should have this light to give the safety signal when the time came to give it. His only purpose in setting down the white light and in picking up the red light and waiving it to and fro, was that he might better attract the attention of the engineer to the danger signal that he had disregarded. The evidence of witnesses that the act of the bridge tender in picking up the red light was a signal of safety, is entitled to no consideration in the face of the positive rules of the company. It is inconceivable how the act of picking up a red light could be a signal of safety, when the rules positively say that the red light is always a signal

of danger and that the only signal of safety was a white light raised and lowered vertically. It is, we think, conclusively shown by the evidence that the engineer was negligent in coming to the draw-bridge without having received the safety signal or the signal to proceed, which was a white lamp raised and lowered vertically. The fact that the bridge tender picked up or had a white light in his hand, or the fact that he set down the white light and picked up a red light, can not be construed into a safety signal of any sort or character. The safety signal could only be given in one way, and there is not a particle of evidence that it was given in the way prescribed by the rules, or in any similar way, or in any way that could have deceived any reasonably prudent person into the belief that it was a safety signal. Indeed the engineer was guilty of the double negligence, of proceeding in the face of a red light, always a warning of danger and a signal to stop, and without waiting for the proper signal from the white light, which was the only authority he could have to proceed. The conduct of the engineer in failing to wait for the regular and usual signal with the white light is attempted to be excused upon the ground that the act of the bridge tender in setting down the white light and in picking up the red light, as testified to by Manning, deceived the engineer into the belief that the vertical signal had been given with the white light. And, in this connection, we are referred to a rule providing that "a bridge signal is displayed in the center of each draw span inside the span at all times, except when moved for the passage of trains." But this rule has no relation to the case whatever, and the act of the bridge tender in seting down the white and picking up the red lantern was in no manner or form a vertical signal to proceed. The fact is that the engineer under all the rules regulating the movement of the train at draw-bridges was guilty of a high degree of negligence in proceeding before receiving a safety signal, and that this disobedience of the rules on his part was the sole and proximate cause of the accident, is as plain as evidence can make it. It is indispensable to the safety of the traveling public that rules like the ones we have been considering should be literally obeyed by trainmen, and when a trainman whose duty it is to obey these rules is injured as a result of their violation, it is well settled that he can not recover damages from the company. As

said in Sinclair's Admr. v. I. C. R. Co., 30 Ky. Law Rep., 1040:

"Absolute obedience to orders regulating the movement of trains is indispensable to the safety of life and the protection of property, and carriers engaged in the hazardous business of transportation by modern methods, have the right to demand the highest efficiency in the service, and to exact implicit obedience to the orders of superiors, and to establish and enforce rules for the discipline of their employes. It is not the purpose of the courts to encourage in any way violations by employes of reasonable rules by relieving them of the consequences of their wrongful acts, or to subject the company to damages caused by their disobedience."

In L. & N. R. Co. v. Scanlon, 22 Ky. Law Rep., 1400, we said:

"The responsible trainman who violates such reasonable rules, of which he has knowledge, and which he has undertaken to regard, must need take upon himself the personal consequences of his dereliction. If injury results to him by reason of such violation, and which would not, in any probability, have occurred but for it, he alone should suffer the consequences of his fault." See also L. & N. R. Co. v. Sewell, 142 Ky., 171; C., N. O. & T. P. R. Co. v. Lovell, 141 Ky., 249; C., N. O. & T. P. R. Co. v. Silvers, 126 S. W., 121.

If the action had been brought by the personal representative of Porter to recover damages for his death, and the evidence was the same as the evidence in the record before us, it is clear that no recovery could be had, and under the law of Tennessee, Moran, occupies no better position than would the personal representative of Porter.

It is scarcely necessary to notice the question that the bridge tenders were negligent in opening the bridge at the time they did for the purpose of permitting an approaching steamboat to pass through, as there is a total failure of evidence to support this ground of negligence. There is evidence conducing to show that the bridge tenders knew the name and size of the boat that signaled for the draw to open, and the height of its chimneys, and that this boat could have passed under safely without the draw having been opened. In fact, on this occasion it did pass under the stationary span. But, under the rules prescribed by the United States government, it was

the duty of the bridge tenders to open the draw when a signal for this purpose was received from a steamboat, and that they did receive such signal is not denied. They were not required to take any chances on boats passing safely under the bridge. In no contingency, except the one we will presently notice, would it be negligence on the part of the bridge tenders to open the draw in answer to the signal that it be opened, although they might know that the boat calling for the draw to be opened could pass safely under the bridge without opening it. But if there was a train or wagon or vehicle *passing over the draw, or a train approaching so closely that it could not be safely stopped before reaching the bridge, then it would be the duty of the bridge tenders to keep the bridge closed until the vehicle or train had passed over it or reached a safe place, and any failure to observe this safeguard for the protection of life and property would of course be negligence on their part for which an action would lie. But when the bridge tenders started to open the draw, the train was so far from the bridge that no question is made that it could not have been stopped long before reaching the bridge, if the engineer had observed the rules governing the movement of his train.

Under the evidence, the motion for a peremptory instruction on behalf of appellant should have been sustained.

Wherefore, the judgment is reversed, with directions to proceed in conformity with this opinion.