## Meyers' Administratrix v. C. & O. Railway Company.

(Decided March 14, 1924.)

Appeal from Kenton Circuit Court
(Common Law and Equity Division).

1. Commerce—Switch Engine at Time of Accident Held Not Engaged in "Interstate Commerce."—Where there were no more cars to be moved by switch engines, and the only business the engine had upon a track at the time of an accident resulting in the death of the engineer was to accommodate helpers in transferring a retracker from one end of the yards to the other, the engine and deceased were not engaged in "interstate commerce,"

and recovery could not be had under the federal employers' liability act (U. S. Comp. St., sections 8657-8665).

2. Evidence—Statement of Deceased Engineer Falling Through Trestle Held Inadmissible as Hearsay and as Not a Part of Res Gestae.—In an action for death of engineer on switch engine falling through a trestle, a statement by the deceased just before the accident to the fireman, that yard foreman had said the trestle was safe, was hearsay and inadmissible, and not part of the res gestae.

3. Master and Servant—Employe Knowingly Violating Rule Cannot Recover Damages.—An employe who knowingly violates rules of the master cannot recover damages.

4. Master and Servant—Engineer Driving on Prohibited Track Assumed Risk.—Engineer of switch engine in driving beyond the limits allowed by bulletin prohibiting the use of certain tracks because unsafe assumed all the risks of danger incident to the violation of the rule.

5. Master and Servant—No Recovery Under Federal Act Unless Master has Violated Duty.—Under the federal employers' liability act (U. S. Comp. St., sections 8657-8665) contributory negligence does not wholly defeat recovery; but if the master was not guilty of a violation of duty, and was therefore free from negligence, no recovery can be had.

6. Master and Servant—Assumed Risk Defense Under Federal Act.—While the federal employers' liability act (U. S. Comp. St., secitons 8657-8665) does not allow the employer to escape liability altogether on the ground of contributory negligence, such responsibility may be avoided if he pleads and establishes assumed risk.

JOHN T. MURPHY and O. M. ROGERS for appellant.

MAURICE L. GALVIN and JOHN L. RICH for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE SAMPSON— Affirming.

Appellant, who was plaintiff below, seeks by this action to recover damages for the death of her husband caused, as it is averred in the petition, through the negligence of the C. & O. Railway Company while it and he, as its employe, were engaged in interstate commerce. The action was brought under and pursuant to the federal employers' liability act. The accident which resulted in the death of Frank Meyers, a railroad engineer, happened in the C. & O. yards on July 11, 1920, which yards are located between Third and Fourth streets and Smith and John streets in the city of Cincinnati, and are elevated, being supported by trestles some twenty-

five or thirty feet in height. The deceased, Meyers, was an experienced railroad engineer, having been in the employ of the appellee company running its engines for many years. He and his crew were in charge of a switch engine which moved the cars about in the yards near the freight depot in the block to which we have referred. It appears from the evidence that most of the cars that came into that yard were unloaded at the depot and that at very infrequent times cars were loaded out from that depot. •

In March before the accident in July the company issued a bulletin respecting the tracks in the yards which read as follows:

"Covington, Ky., March 24, 1920.

"NOTICE

"ALL CONCERNED:

"Tracks 6 and 7 at Fourth street freight house are O. K. for engine to go back to bumping block.

"Tracks 4, 5, and 8 are not safe for engine to go further than the iron work of the bridge.

"W. J. Neal,<br>Terminal and train master."

This bulletin was posted at various places including the Covington roundhouse and at the depot in the yards. In order that there might be no question about whether the engineers operating over the tracks mentioned in the bulletin knew of its contents, they were each required to sign their names to it. Accompanying the record is a photograph of this notice and bulletin with the signature of Meyers and others. It is admitted by appellant that the deceased Meyers signed this bulletin, in acknowledgment of his knowledge of its contents.

While the deceased was on the engine with his fireman moving it over track No. 5, beyond the bridge it fell through the trestle to the street and instantly killed Meyers. At the conclusion of all the evidence the court on motion of the defendant directed the jury to find and return a verdict for the company, which was done, judgment being entered in accordance therewith. Of this ruling the administratrix complains and now prosecutes this appeal to reverse the judgment.

There are two outstanding questions in this case, the determination of which is conclusive of the rights of the parties: (1) was the deceased and his crew engaged in interstate commerce at the time of the accident

which brought about the death of Meyers? (2) Was the disobedience of the rule by Meyers, promulgated by the notice the bulletin contained, above copied, thus bringing about his death, such negligence or misconduct as to bar a recovery by his administratrix?

1. In order to determine these questions correctly we will briefly state the evidence: There were two cars off the track in the yards, one upon track No. 4, some distance beyond the steel bridge, and the other on the house track, next to the depot. Before the car on track No. 4 could be moved it was necessary to put it back on the rails. For this purpose the company used a tool called a retracker. It was rather heavy but could be handled by two or more men. When it was placed in proper position on the track the engine would pull the cars back on the track. This retracker was used in putting the car back on the track on track 4, and was left there. In putting this car back, which was quite a distance beyond the steel bridge, the engine was not allowed to pass beyond the bridge. To avoid this they picked up several cars which were much lighter than the engine, and placed them in front of the engine, sent them over track No. 4 and connected them to the car which was off the track, and when thus connected, started the engine and pulled the car back on the track by means of the retracker. It will thus be seen that in retracking the car, engineer Meyers and his fireman carefully observed the bulletin forbidding the engine to go beyond the steel bridge. After doing some other work with the engine the crew was sent to undertake the work of retracking the car on the house track and of course needed the retracker. This tool was heavy and unhandy to carry. To accommodate the men who were working on the yard the engine, with the deceased in charge, started down on track No. 5 beside track No. 4 for the purpose of picking up the retracker and carrying it back up to where it was needed for use in rerailing the car. Before the engine started on track No. 5 the engineer, who had his lunch with him, left the throttle and turned it over to the fireman and went to the other side of the engine cab and began to eat his lunch. The fireman was operating the engine according to signals and instructions. As he came up to the bridge he enquired of the engineer if he should stop there, and getting, as he thought, a negative response but having in mind the bulletin, he brought the engine to a full stop at the bridge. The engineer directed

him to go on. These facts are set forth in the evidence of the fireman, stating, "Mr. Meyers (deceased) was eating his lunch; he gave me a signal to go ahead. I said I did not see anybody; he said, go ahead. I said we have no business off that steel work. He said Creighton said the carpenters had finished, to go any place we wanted to. He gave me the signal, and I drove the engine cautiously down in there." Further testifying the witness said: "He (Meyers) said I had a talk with Creighton and he said it was all right; he said go anywhere they wanted you to. They want the retracker." "Q. You relied upon the statement? A. Yes sir."

After they had gone down upon track No. 5 for the purpose of getting the retracker, and after it had been loaded and while the deceased was either getting on or off the engine, it fell through the trestle and so injured Meyers that he immediately died.

According to the undisputed evidence the engineer was not authorized to take his engine down on track No. 5 at the time of the accident. The brakeman testifying concerning the matters, stated: "Q. What did you go in 5 for? A. For the retracker. Q. Did you have any work in there—any cars in there that you went in there for? A. No, sir. Q. Did you place any cars in there at that time? A. No. Q. It was simply the business of picking up the retracker? A. Yes, sir. Q. Whose business was it to get the retracker and put it on the engine? A. It was the helper's business and the fore-man also. Q. That was not a part of the engineer's or fireman's duty? A. No, sir."

Another witness, conductor Jones, testified: "Q. After the derailed car on track No. 4 was retracked what, if anything, did you have to do again in track 4 that night? A. Nothing at all. Q. Your work was completed? A. Yes, sir. . . . Q. Was there any work to be done by your crew in the movement of cars of any kind on track No. 5 after you directed Mr. Hukill to go get the block, press the button? A. None whatever. Q. What business, if any, did that engine operated by Mr. Meyers have in on track 5, if you know? A. It had no business at all. Q. Do you know how the retracker was gotten back at the end of track 4 where you retracked that car? A. They were carried back there. . . . Q. The only purpose of going in there (on track 5) was what? A. To reload the retracker; put them back on the engine. The retrackers we had used in retracking the car on track 4."

It will thus be seen that there were no more cars to be moved on tracks 5 or 4 on that day, and that the sole and only business which the engine had upon track 5 at the time of the accident was to accommodate the helpers in transferring the retracker from one end of the yards to the other—the same yards.    Certainly that was not interstate commerce.    It had no relation to interstate commerce.    Even though the engine had moved cars that day in interstate commerce that work had been completed and it was then engaged solely in the work of transferring the retracker from one place in the yards to another.

As this was not interstate commerce the deceased Meyers was not engaged in interstate commerce at the time of the accident which brought about his death and his administratrix could not maintain an action for damages under the employer's liability act.    L. & N. v. Parker's Admr., 242 U. S. page 13; Ill. Cent. Ry. Co. v. Behrens, 233 U. S. 473; Lehigh Valley Ry. Co. v. Jas. H. Barlow, 244 U. S. 182-183.

2. It is certain from all the evidence that the deceased Meyers knew of the existence of the bulletin copied above and had signed it on March 24, 1920.    Moreover he had in the operation of the engine observed it from day to day and his fireman who worked with him knew that he had been observing it.    It is in evidence that an engineman had no right, when a bulletin like the one to which we have referred is in force, to move his engine beyond the steel bridge no matter what unofficial information he might have received on the outside.    When a bulletin is promulgated it is the duty of the engineman to observe it until it is set aside or revoked in the manner customarily employed by the railroad company to set them aside.    In the case of Gatliff Coal Co. v. Peace, 174 Ky. 572, we said:

> "It has been written many times by this court that employers of labor have the right to adopt reasonable rules and regulations for the safety and protection of their employes; and that when rules of this nature have been adopted, an employe who is familiar with the rules, cannot recover from the employer damages for injuries received at a time when he was violating the rules, or damages for injuries that would not have been received except for his violation of the rules."

See also Consolidated Coal Co. v. Carter, 187 Ky. 570.

In the case of Elkhorn Coal Corporation v. Guttadora, 190 Ky. 770, we said:

"We have repeatedly and consistently held that where the servant knowingly and wilfully violates a printed rule provided by the employer for his safety, and there is proof tending to show that his injuries may be attributed to its violation by him, there can be no recovery. L. & N. R. R. Co. v. Moran, 148 Ky. 418; L. & N. R. R. Co. v. Smith's Admr., 186 Ky. 35; L. & N. R. R. Co. v. Kroft, 156 Ky. 66; 26 Cyc. 1267."

From all of the evidence it clearly appears that the deceased, Meyers, knew of the existence of the bulletin and realized the importance of observing it. He did not overlook it at the time he directed his fireman to move the engine down on track No. 5 immediately before the accident. This is made manifest by the testimony of the fireman who tells the conversation from which we learn that he called the attention of the engineer sharply to the bulletin and that they had no business with the engine down on track 5 beyond the bridge. The engineer therefore had in mind the bulletin at the time he directed the fireman to drive the engine beyond the bridge. But for the direction of the engineer given to the fireman to drive the engine down on track 5 the accident would not have happened. The engineer knew he should not move the engine upon that part of the track or at least he knew of the rule and his duty when reminded of the bulletin. He replied, "I had a talk with Creighton (foreman) and he said it was all right; he said go anywhere they wanted to go; they want the retracker." At another time, testifying concerning the same conversation, the witness said that Meyers told me that Creighton had informed him that the tracks had been repaired and were safe, and that relying upon that statement he drove the engine down on track 5. Appellant relies upon this evidence as a waiver or justification of the conduct of the deceased in driving the engine beyond the bridge, and insists that the railroad company, through its yard foreman, waived the bulletin and all rights of defense thereunder by verbally informing Meyers through the yard foreman the trestles were safe. In the first place there is no competent evidence in the record that Creighton made any

such statement to Meyers. The fireman testified that Meyers told him that Creighton had said that the tracks were safe. This is mere hearsay. It was not a part of the *res gestae*, for it happened some time before the accident. As this testimony was allowed to go to the jury the appellee company to overcome it introduced Creighton as a witness who testified positively he made no such statement to Meyers or to anyone else. However that may be we are inclined to the opinion that a written bulletin or notice posted and published as was the bulletin in this case, cannot be waived or withdrawn by the mere verbal statement of the foreman even though he is in charge of the work where the employe with the knowledge of the bulletin disregards it and brings about the injury.

It is a well established rule that an employer who knowingly violates the rules of the company cannot recover damages. In the case of L. & N. Railroad Company v. Moran, 148 Ky. 418, we held in substance that an employe who is injured as a result of his disobedience of a reasonable rule promulgated by the company for the government of its employes cannot succeed in a suit against the master to recover damages for the injuries sustained. This seems to be the general rule and has been approved in many cases and by numerous text writers. L. & N. v. Sewell, 142 Ky. 171; C. N. O. & T. P. Ry. Co. v. Lovell's Admr., 141 Ky. 249; C., N. O. & T. P. Ry. Co. v. Silvers, 126 S. W. 121.

In driving his engine beyond the limits allowed by the bulletin engineer Meyers assumed all the risks of danger incident to the violation of the rule. Under the employers' liability act contributory negligence does not wholly defeat recovery; but if the master was not guilty of a violation of duty and was therefore free from negligence no recovery can be had. In other words in cases where the employe is guilty of all the negligence which contributed to bringing about or producing the injury he has no cause of action against the master. The distinction between assumed risk and contributory negligence is well stated in the case of C., N. O. & T. P. Ry. Co. v. Goldston, 156 Ky. 410, where we said:

> "It is well in this connection, perhaps, to discriminate between assumption of risk and contributory negligence. 'Assumption of risk' is in effect a waiver of defects and dangers, and a consent on the part of the employe to assume them, no matter whether he be careful or negligent in his conduct.

This consent is held to take away the injurious character of defendant's act and is bottomed on the old maxim, *volenti non fit injuria*—that to which a party assents is no wrong. In such cases the injured party may at the time be in the exercise of all the care which the law requires, and still have no right to recover. This is clearly pointed out in the old case of Thomas v. Quartermaine, *supra*. Of course, facts showing contributory negligence may also prove assumption of risk; but rarely if at all will proof that one did not assume a risk also show that at a given time he was in the exercise of ordinary prudence for his own safety. These distinctions have not always been observed, but they are essential to a proper application of the facts to a given case. . . . Assumption of risk is a matter of contract, express or implied; while contributory negligence is a matter of conduct.''

While the federal employers' liability act does not allow the employer to escape liability altogether on the ground of contributory negligence such responsibility may be avoided if he pleads and establishes assumed risk. In McFarland v. C & O. R. Co., 177 Ky. 551, we stated the rule as follows:

"Assumption of risk is a rule of the common law and is based on contract, and, by implication, on a servant's act in voluntary exposing himself to danger. Wilson v. Chess and Wymond, 117 Ky. 567; L. & N. v. McMillen, 142 Ky. 257; Dow Wire Works v. Morgan, 29 Rep. 854; Cumberland Tel. & Tel. Co. v. Graves' Admr., 31 Rep. 927; Fuller v. I. C. R. R. Co., 138 Ky. 42; L., H. & St. L. Ry. Co. v. Wright, 170 Ky. 230.

"The fact that the action was brought under the federal employers' liability act does not prevent the appellee from relying upon the defense of assumption of risk. That statute only abolishes the assumption of risk as a bar to an action against a railroad company by an employe for an injury attributable to defective appliances upon or connected with the trains of the railroad company; and neither a station, water tank, rope nor scaffold is an appliance within the meaning thereof. Hence, the common law rule with respect to the employer's assumption of risk of injury from a defective appliance, governs

an action under the employers' liability act where such appliance is not embraced by the terms thereof." McFarland v. C. & O., 177 Ky. 551.

Having reached the conclusion that the deceased, Meyers, was not engaged in interstate commerce at the time of the accident, and that he assumed the risk of danger when he violated the bulletin and drove his engine beyond the steel bridge, we are forced to the conclusion that his administratrix is without remedy. This being true the judgment must be and is affirmed.

Judgment affirmed.