## Norfolk & Western Railway Company v. Short's Administrator.

(Decided October 24, 1916.)

### Appeal from Boyd Circuit Court.

1.    Master and Servant—Railroads—Employers' Liability Act—Death. —Under the Employers' Liability Act the contributory negligence of a servant will not relieve the railroad company from liability for his death if it was guilty of negligence and the contributing

and concurring negligence of the employe and the company caused his death.

2. Master and Servant—Railroads—Employers' Liability Act—Sole Negligence of Employe.—If the negligence of the employe was the sole cause of his death or if the railroad company did not commit any breach of duty that it owed him, there can be no recovery in his behalf. In every case before a recovery can be had it must be shown, either by direct or circumstantial evidence, that the railroad company was negligent.

3. Master and Servant—Railroads—Rules—Blue Lights.—A rule of the company requiring employes working between cars at night to put out blue lights has no application to a state of case in which an employe is only passing between the cars.

4. Master and Servant—Railroads—Railroad Yards—When Servant in Line of Duty.—An employe working in a railroad yard can hardly be said to be out of the line of his employment at any place in the yard where he goes to find something needed in the work in which he is engaged. Especially is this true in the absence of a rule forbidding employes to go certain places.

5. Master and Servant—Railroads—"Running Switch" in Yards—Duty of Warning.—It is the duty of a railroad company, in yards where a great number of employes are at work and constantly crossing the tracks, to have some person on the front end of cars shunted in on a track by the "running switch" method to give notice to employes of their approach and to control their movement.

6. Master and Servant—Railroads—"Running Switch"—Duty of Warning.—Where an employe, in passing between standing cuts of cars, carried a lighted lantern that would disclose his presence, the fact that his person was concealed between the cuts of cars will not excuse the company from having a brakeman on the front end of a cut of cars that was shunted in on the track where the cars were standing between which the employe was passing.

7. Master and Servant—Railroads—Custom in Movement of Cars That is Dangerous Will Not Excuse Company.—The fact that a railroad company had a custom of making "running switches" in its yards without any person in charge of the moving cars to give notice of their presence, will not relieve the company of the duty it was under to protect its employes from the danger attending operations like this. A rule or custom that endangers life or puts in peril the safety of employes or others cannot be approved.

J. R. JOHNSON, JR., and HOLT, DUNCAN & HOLT for appellant.

JOHN T. DIEDERICH, PROCTOR K. MALIN and S. S. WILLIS for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This appeal is prosecuted from a judgment of the Boyd circuit court awarding the administrator of R. G. Short two thousand dollars in a suit under the Federal Employers' Liability Act to recover damages for his death.

A reversal is asked upon four grounds:    (1) that Short was not engaged in interstate commerce at the time of his death; (2) that his negligence was the proximate cause of his death; (3) that he was performing no duty he owed the company when the accident occurred; and (4) for error in giving and refusing instructions.

Under the Federal Employer's Liability Act it is necessary, as said by counsel for the railroad company, to allege and prove that the carrier was engaged in interstate commerce, and that the employe was actually employed in such commerce at the time of the injury for which he or his personal representative seeks to recover damages.

Upon this issue it is admitted that the Norfolk & Western Railway was engaged in interstate commerce at the time the injuries, from which Short died, were sustained, and we do not think there is any room for doubt that Short, at the time of his death, was actually employed by the railway company in such commerce. The evidence clearly shows that the train on which Short was working at the time he was injured was an interstate train which had come from a West Virginia coal field and was temporarily stopped on its journey in the yards of the company at Portsmouth, O. In fact, it appears that these yards in the State of Ohio were exclusively used by coal trains going to and coming from the coal fields of West Virginia, so that all the traffic handled in these yards was really interstate traffic.

The next contention is that Short, at a time when he was not in the course of his employment, and by his own negligence, brought about the injury that resulted in his death; and this issue, which is really the principal one in the case, makes it necessary to state in some detail the evidence.

In the yards at Portsmouth were forty or more switch tracks on which trains were constantly being shifted about during the day and night. There were employed in the yards about eighteen hundred men engaged in different kinds of service connected with the movement of trains and the handling and repair of cars;

and these men in the course of their various duties were at all times going about in the yards crossing and re-crossing these switch tracks.

Short and one Ferris Dials, at the time the accident that resulted in the death of Short occurred, were em-ployed as repairmen in the yards. Their duties con-sisted in looking over the coupling apparatus of the cars to see if they were in good order, and if not it was the duty of these men to repair them.

The yards were divided into what is called the "heavy side" and the "light side," and separate crews of men worked on each of these sides. It further appears that Short and Dials were engaged at work on the "heavy side" of the yard.

On the night Short was killed these two men in the course of their duties discovered that the knuckle pins in the couplings on one of the cars standing on track number nine on the "heavy side" of the yard were either defective or missing, and so it became their duty to sup-ply the defective or missing knuckle pins with others. It also appears that the railway company had places on the "heavy side" of the yard where it kept extra knuckle pins and other like repairs for use when needed, and this fact was known to Short as well as Dials, as Dials had been working on this "heavy side" as a repairman for several months, although Short had been there only a few days.

It is further shown in the evidence that the extra knuckle pins, that were kept in a box convenient to the place where this defective car was standing, had all been used, and so it became necessary for these men to get knuckle pins some other place. They could have gotten them out of a supply kept at a place on the "heavy side" some distance from where they were working, but in-stead of going to this place Dials suggested that they could go down to the "light side," which was closer, and find knuckle pins there. And so each with a lantern in his hand walked across the tracks from track nine on the "heavy side" to track seventeen on the "light side." When they got to this track Dials found one knuckle pin and Short, while looking around for another, had occas-ion to cross track sixteen in an open space that had been left between two cuts of cars standing on this track. At the time that Short stepped in this open space between the standing cars on track sixteen, a cut of cars that

had been shunted in on track sixteen by an engine, in making what is called a "running switch," struck one cut of the standing cars between which Short was walking, or standing, causing it to suddenly collide with the other cut of standing cars, and Short was instantly killed in the collision.

The two cuts of cars between which Short was crossing the track, were standing probably five hundred feet from the end of the switch on which the engine shunted the cars from the lead track onto switch track sixteen, but the engine before it had been cut off from the string of cars shunted in on track sixteen had given these cars sufficient momentum to cause them to roll along on track sixteen from the head of the switch to the cut of cars standing on this track.

It was further shown without dispute that there was no brakeman on the front end of the cut of cars that was shunted in on the track, nor was any notice or warning given by ringing the bell or blowing the whistle of the engine, or in any other way that this cut of cars would be or was being shunted in on this track, and so they went without any person on or about them to control their movement or give notice or warning of their approach.

It is also shown in the evidence in behalf of Short's administrator, although contradicted by the evidence for the railway company, that it was customary for repairmen working on the "heavy side" to go to the "light side" when they wanted for repair purposes appliances such as knuckle pins that could be found on the "light side." Especially was this practice engaged in when it happened that the car in need of repair was some distance from the place where repairs on the "heavy side" were kept, or if the supply of repair parts at these places was exhausted.

It is also shown that it was not customary in the movement of trains in the yards to give notice or warning of their approach by ringing the engine bell or blowing the whistle, nor was it usual to have a brakeman on the front end of the cars when they had been cut loose from the engine by the process of a "running switch." It was further shown that the company had adopted rules, with which it may be presumed Short was familiar, requiring employes when they went between standing cars for the purpose of making repairs in the night time.

to put blue lights at each end of the cars between which they intended to work as notice to the trainmen that repairs were being made in and about the cars. But we do not think this rule has any application to the case we have, because Short did not go between these cuts of cars for the purpose of making repairs. He was only passing through the open space between the standing cars in his effort to find a knuckle pin.

Whether Short would have heard the engine bell ringing if it had been at the time this cut of cars was shunted in on track sixteen, or whether a brakeman on the front end of the cut of cars, if there had been one, could have discovered the presence of Short in time to have warned him of the danger he was in, is not clearly developed in the evidence, as there was no person immediately about giving attention to the movements of Short or the cars; although there is, we think, sufficient circumstantial evidence to show that a brakeman on the front end of the cut of cars could have seen the light from Short's lantern in time to have given him warning of the approach of this cut of cars.

It should further be kept in mind that this case was under the Federal Employers' Liability Act, and so the contributory negligence of Short, if he was guilty of any, in going between these two cuts of cars without first satisfying himself that it was safe to do so, will not relieve the railway company from liability, if it was guilty of negligence, and the contributing and concurring negligence of Short and the company caused his death, because, as said by the Supreme Court of the United States in Illinois Central Railroad Co. v. Skaggs, 240 U. S. 66, 60 Law Ed., ........: "It cannot be said that there can be no recovery simply because the injured employe participated in the act which caused the injury. The inquiry must be whether there is neglect on the part of the employing carrier, and if the injury to one employe resulted 'in whole or in part' from the negligence of any of its other employes, it is liable under the express terms of the act. That is, the statute abolished the fellow-servant rule. If the injury was due to the neglect of a co-employe in the performance of his duty, that neglect must be attributed to the employer; and if the injured employe was himself guilty of negligence contributing to the injury, the statute expressly provides that it 'shall not bar a recovery, but the damages shall be diminished

by the jury in proportion to the amount of negligence attributable to such employe.' ''

If, however, as contended by counsel for the railway company, the negligence of Short was the sole cause of his death, or if the railway company did not commit any breach of duty that it owed him, there can be no recovery in behalf of his administrator. In every case like this before a recovery can be had it must be shown by either direct or circumstantial evidence that the railway company was negligent; or, in other words, that it owed a care and failed to exercise it.

As these principles of law must control the case, let us see now if the contention of the company that Short, in going between these cars for the purpose and at the time and under the circumstances stated, was acting outside the line of his duties, and his own negligence was the sole cause of his injury.

The argument in behalf of the railroad company, that Short's negligence was the sole cause of his death, is put upon the grounds (1) that he did not put out the blue lights heretofore mentioned; and (2) that it was his duty to have gotten the needed knuckle pins on the "heavy side" of the yards, and so when he left the "heavy side" and went on the "light side" where he had no duty to perform, he took the chance of being injured and was, in fact, little short of a trespasser, to whom the company owned no duty except to exercise ordinary care to prevent injury to him after his peril was actually discovered.

We have already determined that the blue light rule invoked has no application to the case, and hence the inquiry upon the point now under consideration may be limited to determining whether Short was entirely out of the line of his course of employment and not performing any duty required of him by the company when he went on the "light side" to find knuckle pins.

There was no rule of the company requiring Short or Dials to get knuckle pins on the "heavy side" or that warned against or prevented them from going to the "light side" to find these pins, and, as stated, there is evidence that it was customary for repairmen to get appliances like this at any place in the yard they could be found. The fact, that the company had appointed places on the "heavy side" where it kept these appliances for convenient use on the "heavy side," does not

furnish sufficient evidence to show that Dials and Short were violating any rule of the company when they went to a convenient place on the "light side" after finding that the supply of pins that had been kept at a convenient place on the "heavy side" was exhausted.

An employe working in a railroad yard can hardly be said to be out of the line of his employment at any place in the yard where he goes to find something needed in the work in which he is engaged. And certainly the principle invoked in behalf of the railroad company should not be applied in the absence of a rule or convincing evidence that Short should not have left for any purpose the "heavy side" of the yard. As Short was not prohibited by any rule of the company from going to the "light side" of the yard, and it was customary for repairmen to go any place in the yard where they could find the repair parts needed, we think that Short came to his death while he was in the course of his employment, and therefore the company owed him the same duty of care that it would have owed him if he had been working as a repairman on the "light side" of the yard. And this being so, the fact that he went to the "light side" of the yard to get these pins was not such negligence on his part as would preclude a recovery by his administrator upon the theory that his conduct was the sole cause of his death. He may have been guilty of contributory negligence in going between the cars without first satisfying himself that the place was free from danger, but the failure on his part to exercise this degree of care does not prevent a recovery. It only goes to diminish the amount of the recovery.

This brings us to consider the question whether the company was under a duty to give a warning or notice of the movement of the cut of cars that caused the death of Short. If it was under such a duty, then its failure to give notice or warning, if such failure contributed to bring about the death of Short, was actionable negligence.

It seems to us that upon this point the case must be controlled by the rule laid down in L. & N. R. Co. v. Johnson's Adm., 161 Ky. 824. In that case it appears that Johnson, an employe, came to his death, while working in the yards of the company, under circumstances very similar to those surrounding the death of Short. In that case, as in this, it was contended on behalf of the

railroad company that in the movement of cars in its yards it did not owe to employes the duty of lookout or warning, but the court said:

"In yards like the one here in question, occupied by a large number of employes moving about in the performance of their various labors, we think it was the duty of the railroad company, when it shunted the cut of cars or a single car on track number eight, to have a person on the forward end of the front car for the purpose of giving warning of its approach and to control its movement, and that it should have been run at such a rate of speed as to enable the person in charge to give effective notice of its presence to any person on the track."

It was further said, in answer to the argument that the rule announced by this court in many cases that in places where the presence of persons on railroad tracks must be anticipated, it is the duty of the railroad company in the movement of its cars and engines to keep a lookout, observe a reasonable rate of speed, and have some person in a position where he can control the movement of the cars or engine, applied only to persons not employes who were injured at highway crossings or in cities or town or populous communities. But in answer to this the court said:

"Generally speaking, this is true of this line of cases, but we are unable to perceive any good reason why this humane and wholesome rule, established for the protection of life and limb, should not be extended to embrace employes in yards where such a number of employes are engaged as to put upon the company the duty of anticipating their presence upon the tracks. There is no reason why the same degree of care should not be exercised in the movement of cars and engines in such yards as is required in their movement in populous communities or in towns and cities, except, of course, that employes who are themselves charged with the duty of looking out for the movement of engines and cars are not entitled to this protection: C., N. O. & T. P. Ry. Co. v. Swann, 160 Ky. 458. But in all yards like the one where Johnson was killed there are numbers of employes who are not specially charged with the duty of keeping an eye on the movements of cars and engines for the protection of other persons or property, and as to this class of employes the railroad company is under

a duty to exercise the care indicated to protect them from injury; and this is so whether the injured employe belonging to this class is directly engaged at his work or is standing or moving about in the yards on some matter not immediately connected with his work, because all of the employes in the yards, with the exception of those noted, have the right to depend upon the company exercising the measure of care we have laid down and to govern themselves accordingly.''

It is attempted, however, to distinguish the Johnson case from the case we have upon the ground that Johnson was in a position where he could have been seen if there had been a lookout, while in this case it is said that a lookout could not have discovered the presence of Short, as he was between the cuts of cars at the time the collision occurred. Short, however, carried a lighted lantern, and while it appears that this lantern was partly covered with a hood, it is nevertheless made plain that it gave a good light, and although the person of Short may have been concealed between the cars, it is fair to presume that if there had been a brakeman on the end of the cars he would have known from the light between the cars that some employe was there. In cases like this we do not think any refined distinctions should be made for the purpose of absolving the company from what we conceive to be a clear duty that it owes to its employes in yards like this. In these yards, as we have said, hundreds of men were employed day and night, constantly going in and about and between standing and moving cars, and while it is true that in yards like these the employes must take notice of the movement of trains and engines and endeavor to keep out of their way, it is likewise true that the company should take some care to prevent killing or crippling them.

As this court has said in a number of cases cited in the Johnson case, a single car or a cut of cars turned loose to run of its own momentum, without any person in charge to control its movement or give warning of its presence, is an extremely dangerous agency at a place where many men are constantly crossing the track. The movement of such cars is accompanied by little noise, and where hundreds of other cars are standing about, the approach of the moving cars might not be observed by an employe bent on the duties he was engaged in until too late to escape being caught and killed or injured.

Nor will the fact that there was a custom prevailing in the yard to make "running switches" without any person in charge of the moving cars to give notice or warning of their presence, relieve the company of the duty it was under to protect its employes from the danger attending operations like this. As said in C., N. O. & T. P. Ry. Co. v. Lovell's Admr., 141 Ky. 249, "The railroad company will not be permitted to shelter itself under a custom that involves a reckless disregard of human life. . . . . Rules and regulations are necessary in the conduct of the business of railroading, and when reasonable and not against public policy they should be and are looked upon with favor by the courts. . . . But a rule or custom that endangers life and puts in peril the safety of employes or others, cannot receive our approval."

The instructions are criticised, but the criticism goes only to the extent that they put upon the company the duty of maintaining a lookout in the movement of its cars, and as these objections have been fully disposed of, it is not necessary to further extend the opinion in discussing the instructions. Under our view of the case the instructions, which conformed to the law as laid down in the Johnson case, were correct.

The judgment is affirmed.