## Louisville & Interurban Railroad Company v. Kraft.

(Decided November 21, 1913).

### Appeal from Jefferson Circuit Court (Common Pleas Branch No. 2).

1. Railroads—Rule in Case of Delay of Train—Duty of Flagman——Collision—Instruction.—Under a rule of the company it was the duty of the flagman or conductor when a train is delayed to go immediately back and signal trains approaching from the rear, and there being evidence in this case where a trolley was broken and the car stopped, that the conductor did not immediately obey this rule, and a collision resulted, a peremptory instruction was properly overruled.

2. Railroads—Duty of Trainmen to Obey Rules of Company—Protection of Employees and Passengers—Erroneous Instruction.—It is the imperative duty of trainmen to obey the rules of the company designed and promulgated for the protection of their employes and passengers; an instruction imposing upon them only the duty of using ordinary care to do so is erroneous.

FAIRLEIGH, STRAUS & FAIRLEIGH, ALFRED SELLIGMAN and HOWARD B. LEE for appellant.

ALEXANDER SCOTT BULLITT, KEITH L. BULLITT, WM. MARSHALL BULLITT, HELM BRUCE and BRUCE & BULLITT for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Reversing.

On the evening of July 2, 1911, appellee while acting as motorman on one of the electric cars of appellant was severely injured, and instituted this action for damages.

On the day in question he had taken his car on a trip from Louisville to LaGrange, and left that place shortly after seven o'clock on his return trip. He was running a regular car, and when he reached Pewee Valley on his return trip he was notified that an extra car, running on the same time as his, had started to Louisville immediately ahead of him. When about one-half way between Marshall's Station and Anchorage, just after going around a curve, he ran into the rear of the forward car, and as heretofore said, was himself severely injured.

At the point of collision the forward car had "gone dead" because its trolly had left the wire and been knocked from it. From Marshall's Station, westward, towards Louisville is a reverse curve, and the point of collision was a short distance west of where this curve ended.

The questions upon which this appeal must be determined all grow out of and are incident to three rules of the company, which were introduced in evidence, and which are as follows:

"209. All extra trains must keep out of the way of regular scheduled trains and clear their time at least five minutes, unless they have been given a meeting or passing order, or other orders relieving them from this necessity."

"210. Unless some form of block signals be used, clearing at least five minutes apart, trains running in the same direction must keep not less than one thousand (1,000) feet apart, except in closing up at stations or meeting point. When the view is obscured by curves, fog, storms, or other causes, they must be kept under such control that they may be stopped within the range of vision."

"219. When a train stops or is delayed under circumstances under which it may be overtaken by another

train, the conductor or flagman must go back immediately with red signal a sufficient distance to insure full protection, not less than one thousand (1,000) feet. When recalled he may return to his train, first placing two torpedoes on the rail when the conditions require it. The front of a train must be protected in the same way when necessary, by the motorman. The duty herein required of the conductor or motorman may be performed by the other when desirable for any reason.''

The trial resulted in a verdict of $10,000 for appellee, and from the judgment on that verdict this appeal is taken.

Appellant insists (1) it was entitled to a peremptory instruction, and (2) that the court erred in defining the degree of care which was required of appellee in observance of the rules.

The evidence upon the part of appellee is that he was running about ten or fifteen miles an hour around the curve; that it was about 7:45 p. m. and was dark, and that he had all of his lights on, including his head-light; that in going around the curve his head-light shone straight in front of him and did not follow the track, and consequently he could see the track only for a short distance while on the curve; that the first he knew of any danger ahead was when he saw the conductor of the forward car about fifty feet in front of him as he was emerging from the curve, the conductor at the time being about fifty feet from the forward car; that the conductor was waiving his hands, and appellee immediately applied the brakes, and as quick as he could put on the reverse current, but was unable to stop his car and collided with the standing front car. The two cars were running on the same time, and appellee's evidence is by himself and one or two other witnesses that the rear car was from thirty seconds to three or four minutes behind the schedule time.

The evidence for the appellant is that the forward car was practically on time when the trolley broke, and that as soon as the conductor of that car could get off when it ''went dead'' he ran back up the track, and at a point 150 or 200 feet from the ''dead car'' waved his hands and cap at the approaching rear car; that it was broad daylight, and the lights had not been turned on in the forward car; that the rear car was running around the curve at the rate of 15 or 20 miles an hour;

that it was so light that one witness sitting on a veranda 1,000 feet away saw the collision.

The contention of the parties as to the cause of the collision may be briefly stated as these:

(1) It is the claim of appellee that it was the duty of the forward car to have kept at least five minutes ahead of his car; and

(2) When it lost its trolley it was the duty of the conductor to at once come back as far as 1,000 feet to notify the rear car; that the front car had been standing some three or four minutes "dead" on the track before the conductor started back to notify the rear car.

It is the contention of appellant that the motorman of the rear car knowing the forward car was immediately in front of him, as he had been notified at Pewee Valley, should have adhered to the rule about running cautiously around the curve so that he might stop his car at any time within range of his vision, and that his failure to do so was such contributory negligence as precludes a recovery by him in this action.

There was evidence by a witness who boarded the rear car at Marshall's Station, that the forward car had passed there two or three minutes ahead of the one which he boarded, and from this it is argued that when the forward car broke its trolley and "went dead," if it was two or three minutes ahead of the other car and the conductor had immediately complied with the provision of rule No. 219, the accident could have easily been averted; but strange as it may seem no single occupant of the forward car was introduced as a witness in this case except the conductor, and his statement is that he immediately started back up the track after the accident to the trolley and had proceeded about 150 or 200 feet when the rear car came in sight. But if, as stated by the passenger of the rear car who boarded it at Marshall's Station, it was two or three minutes behind the other car the jury had a right to infer that the provisions of rule 219 were not complied with and that that was the direct cause of the accident, and for that reason the motion for a peremptory instruction was properly overruled.

It is perfectly manifest from this record that the accident was either caused by the failure of the trainmen on the forward car to give the notice required by rule 219, or by the failure of the motorman of the rear car to comply with the provision of rule 210 that when his

view was obscured by a curve he must keep his car under such control that he could stop it within range of his vision.

In the first instruction the court told the jury that it was the duty of the trainmen in charge of the forward car to exercise *ordinary care* to promptly give timely warning or notice to those in charge of the rear car of the collision; and in the second instruction the jury was told that it was the duty of the plaintiff, who was operating the rear car, to exercise ordinary care, to follow and comply with the rules of the company in operating and managing his car.

So the remaining question is, do these instructions require of railroad trainmen a sufficiently high degree of care in obeying the rules laid down by the company designed for their own protection and the safety of the traveling public?

It cannot be doubted that the safety of employes and passengers demands that a higher degree of duty be imposed upon trainmen to obey rules than is required by the instructions in this case.

The lives of millions of people are entrusted to trainmen each day; the companies should, and usually do, select such employes with great care. They are required to be intelligent, sober, alert, and courteous, and it is demanded and expected of them that they shall always obey the rules which are prepared and promulgated for the purpose of protecting lives and property. Can it be said that trainmen are only required under the law to use *ordinary care* to obey rules designed to protect the lives and limbs of the human freight entrusted to them?

Having in mind the protection of the traveling millions, is it not more in accord with reason and humanity, to demand of them the *imperative duty* to conform to these rules so designed for the protection of passengers as well as employes? It cannot be said that trainmen who assume such enormous responsibilities to the public when they accept such employment, have sufficiently discharged such duties when they have used only *ordinary care* to obey the rules of the company, intended alike to protect them and their passengers.

On the contrary, when they fail in such imperative duty and injury results to another could the company's liability be doubted? On the other hand, can it be said that the company would be liable to an employe who only

used *ordinary care* to comply with his positive duty to obey the rules, and who was thereby himself injured?

This is the age of rapid transportation; millions of people are being whirled over the country in all directions each day and night on steam and electric railroads. What higher duty can be imagined than that of promulgating wise rules for their safe transportation, and providing for their strict enforcement?

To say that men entrusted with all these human lives are only required to use *ordinary care* to obey the rules designed for their preservation, would be out of harmony with the progress of the times as well as a shock to humanity; and to say that an employe who had only used *ordinary care* to obey the rules which it was his positive duty to obey, could recover for an injury resulting from such failure, would be equally out of harmony with reason and justice.

It would not be difficult, of course, to imagine a state of case where in an emergency it would be perfectly justifiable to break the rules, but we have no such state of case before us; we are here dealing only with the degree of care required by trainmen in obeying the rules under ordinary conditions.

In this case it was the imperative duty of the conductor of the forward car to have immediately notified the motorman of the rear car as soon as he discovered his trolley was broken; it was likewise the imperative duty of the motorman of the rear car in going around the curve to have kept his car under such control that he could stop it within range of his vision. Failure upon the part of the one or the other to obey the rules brought about this accident.

We are not without authority in Kentucky on this question; Sinclair's Admr. v. I. C. R. R., 30 R., 1040, was an action by a fireman, who had been injured in a collision, brought about through the failure of his superiors to obey the rules, and the court in discussing the duty of trainmen in this respect, said:

"It is of the highest importance that employes of railroad companies who have entrusted to their care so many lives and so much valuable property should be held to a strict observance of the rules of the company established for the protection and safety of the public as well as persons in charge of the train. Absolute obedience to orders regulating the movement of trains is indispensable to the safety of life and the protection

of property, and carriers engaged in the hazardous business of transportation by modern methods, have the right to demand the highest efficiency in the service, and to exact implicit obedience to the orders of superiors, and to establish and enforce rules for the discipline of their employes. It is not the purpose of the courts to encourage in any way violations by employes of reasonable rules by relieving them of the consequences of their wrongful acts, or to subject the company to damages caused by their disobedience.''

The case of L. & N. Railroad v. Scanlon, 22 R., 1400, was an action by the personal representative of a deceased engineer of appellant who had been killed in a rear end collision of his own engine with the rear part of a forward section of the same train. That case also involved the disobedience of the rules of the company by the engineer, and for such disobedience this court said a peremptory instruction should have been given. In discussing the duty of trainmen to obey the rules of the company the court said:

''They of course can operate their trains only by means of trainmen who perform their duties, under the direction of the employer. Modern conditions of transportation and travel are such as to make it impossible to meet their demands upon the larger railroad systems, without the use of such carefully-prepared, and rigorously enforced rules, as will reduce the carriers' work to a well nigh perfect system. The very nature of their business obviously requires that these employes, in discharge of their respective duties, must themselves feel under some obligation to the public they serve. Not only their own lives, but those of their fellows, and large moneyed interests represented by rolling stock and freight, all call for the exercise by the trainmen of a high degree of caution, as well as a strict observance of those rules found by experience to best conserve their own safety, and that of their charges. The responsible trainman who violates such reasonable rules, of which he has knowledge, and which he has undertaken to regard, must need take upon himself the personal consequences of his dereliction. If injury results to him by reason of such violation, and which would not, in any probability, have occurred but for it, he alone should suffer the consequences of his fault.''

The case of L. & N. R. R. v. Hiltner, 22 R., 1141, was an action by the engineer on one of appellant's freight

trains for injuries received by him in a rear end collision. In discussing the infraction of a rule by the engineer this court said:

"But appellee was running the rear train. Upon his management of it the lives of the passengers on the other train depended. The law, in its regard for human life, required him strictly to follow the rules, and not to leave Guthrie within five minutes after the departure of the other train, and to run that much behind it. In addition to all other precautions to prevent rear end collisions, this was incumbent on him; and, however negligent others may have been in observing other precautions, appellant is not liable to him if he was himself at fault, but for which the accident would not have occurred.'

In the foot notes in 24 L. R. A., 657 (O. S.), and in foot notes in 43 L. R. A., 350 (O. S.), will be found interesting and instructive notes and references on this question.

But it is earnestly argued that as the motorman was required by his schedule to go at a certain rate of speed, which the company expected him to do, that the provision of rule No. 210, requiring him when there were obstructions to retain such control of his car so as to stop it within the range of his vision, are inconsistent, and that it was impossible for him to live up to both of them. It is sufficient to say in answer to this that his highest duty was to obey such rules as would bring about safety to himself and to his passengers, and if circumstances or conditions arose which made it impossible for him to run on his schedule time without endangering himself or his passengers his duty was to ignore the rule requiring him to run on schedule time, and observe that rule which would bring about safety to himself and his passengers.

That the rule requiring the motorman to run cautiously and to keep his car under control so that he may stop it within the range of his vision when the view of the track is obstructed is both wise and reasonable is not questioned, nor can it be.

The judgment is reversed, with directions to grant a new trial and for further proceeding consistent herewith.

Judge Nunn dissents.