## Hunsaker, Adminstratrix, et al. v. Ashland Coal & Iron Railway Company.

(Decided October 11, 1918.)

### Appeal from Boyd Circuit Court.

Railroads—Switch Crew—Lookout.—It is the duty of a switch crew about to kick a car against other cars standing upon a switch near which the presence of one or more members of another switch crew are reasonably to be expected, to give timely warning of the approach of the car and to maintain a lookout ahead, and this though the two crews by custom and practice have for many years run the switches and shunted cars without such signals or lookout.

S. S. WILLIS, R. D. DAVIS and C. W. DILLIE for appellants.

HAGER & STEWART, PRICHARD & PUTMAN and PROCTOR K. MALIN for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

This action was instituted by the administratrix of James A. Hunsaker against the Ashland Coal & Iron Railway Company, a corporation, to recover $25,000.00 for his death which, it is alleged, was occasioned through the negligence of the defendant company and its servants. Hunsaker for many years was employed as a conductor by the C. & O. Railroad Company and was in charge of a switching engine and crew in the railroad yards at Ashland, Kentucky. At the time of his death he was fifty-nine years of age. The accident which brought about his death occurred in what is known as the west yards of that company.

In this yard the C. & O. Railroad owns three tracks, and the appellee, Ashland Coal & Iron Railway Company, owns five tracks. The appellee company is engaged in transfer work and is what is commonly known as a terminal railroad, and its business consists of collecting railroad gons from boats and railroad companies and placing them on certain designated tracks, and in some instances to make repairs of cars. Near the point where Hunsaker was injured the tracks of appellee company cross the tracks of the C. & O. Railroad and from this point several switches diverge. These several tracks are used in common by the C. & O. Railroad and appellee company for the shifting and storing of

cars. On the day in question Hunsaker and his crew backed a train of twenty-five or thirty cars up what is known as the main line of the C. & O., crossing the intersection of the A. C. & I. just as the train crew of the A. C. & I. were backing a short train towards the same intersection. As soon as the C. & O. train cleared the switch the A. C. & I., which was waiting, threw the switch and backed into what is known as track number 5 for the purpose of placing a refrigerator car on that track with five other cars previously placed there. The five cars then standing on track number 5 were in two cuts. The first cut consisted of two cars, and the other cut of three cars. Between the two cuts of cars was a space of about four feet. The C. & O. train and its crew stopped on the main track of the C. & O. opposite the five cars and was uncoupling the engine from the cars so that it might go back past the switch and come in on number 5 and couple the five cars there and bring them out and connect them with the other twenty-five or thirty cars, which the C. & O. train had on the main line. While engaged in giving slack for the purpose of uncoupling the engine from the cars the conductor and a brakeman on the C. & O. train stepped across to track number 5 to inspect the five cars which they were to pull. Conductor Hunsaker, observing the space between the two cuts of cars, went into the open space and began to examine the couplings and was attempting to adjust the same so as the two cuts would couple. The brakeman climbed on top the cars and was attempting to loosen the brakes so that the cars could be moved, and while this was going on and without signal or warning of any kind the train of the A. C. & I. Company came through the switch and shunted the refrigerator car on to track number 5 and against the first section of the cars which was already on that track and which by reason of the force collided with the next section of cars, catching Hunsaker on the draw-head between them and so injuring him that he shortly thereafter died. These train crews were each well acquainted with the situation at the point where Hunsaker was injured. It was the business of these trains to go in and out on the several switches frequently during the day. A car inspector on the C. & O. was stationed nearby for the purpose of inspecting the cars placed upon tracks numbers 4 and 5, ordering them to the shop if need be

for repairs, otherwise, there were but few persons who frequented this part of the yards.

At the conclusion of all the evidence the court sustained a motion of the appellee company to peremptorily instruct the jury to find and return a verdict for it, and of this ruling of the court Hunsaker's administratrix complains.

The question is, what duty was the crew of the A. C. & I. train under with respect to Hunsaker and his crew on the C. & O.? Was it the duty of the A. C. & I. crew to give signals or warnings of the approach of its trains, or should it have maintained a lookout on the front of the refrigerator car in order to have avoided injury to Hunsaker and his crew? The evidence shows that in crossing the intersection of the A. C. & I. with the C. & O. railroad it was the custom of each crew to give a signal but that in entering the switches no such signal was required by the custom. It is admitted, however, that the crew on the A. C. & I. train knew that Hunsaker and his crew were in the vicinity of track number 5, and that it was the duty of that crew to remove the cars from that track but there was no schedule time in which to do this work.

It is also in evidence that is was the duty of the C. & O. crew to inspect the cars and their couplings on track number 5 before undertaking to move them, and further to couple any uncoupled cars and to release the brakes on the cars. This was also the duty of the crew of the A. C. & I. before attempting to remove cars from one part of the yard to another. No member of the A. C. & I. crew rode the advance end of the train as it backed into track number 5, but the switchman was on the ground and walked along by the side of the train as it made connection with the cars on track number 5, although he was on the opposite side of the train from the C. & O. crew and could not, therefore, see Hunsaker or other members of his crew.

As a general principle a lookout duty is due to a person in peril whenever the circumstances are such as to enable the person in control of a dangerous agency to anticipate the peril.

So, if the A. C. & I. train crew from the circumstances should have anticipated the presence of Hunsaker or other persons on or near the cars standing on track num-

ber 5, then it was the duty of that crew to sound a warning or maintain a lookout ahead and to guard against injury to such persons.  As it was the duty of Hunsaker and his crew to be on and about track number 5, to inspect the cars and release the brakes thereon, and as this duty was well known to those in charge of the A. C. & I. train, it follows that a reasonably prudent person engaged in such railroading would have anticipated their presence at that point, in view of the fact that the C. & O. train had just stopped opposite thereto.

In the case of Norfolk & Western Railroad Company v. Short's Admr., 171 Ky. 647, where it was shown that Short, who was engaged in repair work on the "heavy side" of a railroad yard, in order to obtain certain pins for repair purposes went to the "light side" of the yard and in doing so was killed while passing through an opening between two cars, much in the same manner that Hunsaker was killed, it was held to be the duty of the railroad company in the movement of its cars and engines to keep a lookout, observe a reasonable rate of speed, and have some person in a position where he could control the movement of the cars or engine, in railroad yards where the presence of persons upon the tracks are reasonably to be anticipated.  As there stated, "There is no reason why the degree of care should not be exercised in the movement of cars and engines in such yards as was required in their movements in populous communities or in towns and cities, except, of course, that employes who are themselves charged with the duty of looking out for the movement of engines and cars, are not entitled to this protection."  It is there held that employes who are not especially charged with the duty of keeping an eye on the movements of cars and engines for the protection of other persons or property, are entitled to a lookout duty from the trainmen even though they may be standing or moving about in the yards on some matters not immediately connected with their work, because all employes engaged about the yards have the right to depend upon the company exercising the proper degree of care for their protection.  See also L. & N. R. R. Co. v. Johnson's Admr., 161 Ky. 824.

To overcome the contention of appellant that Hunsaker was entitled to a warning signal and lookout from the A. C. & I. train, it is urged that by usage and custom in that yard no such signals were given or look-

out maintained. If that be true the company fostered a very dangerous custom and no such dangerous custom should be or will be allowed to abrogate the law. It is apparent from the evidence in this case that the A. C. & I. train moved in through the switch and on to track number 5 so silently and noiselessly that no member of the crew on the other train which was only a car length or two away, knew of its approach. So slight a thing as the ringing of a bell or sounding of a whistle would no doubt have saved the accident and a properly maintained lookout certainly would have discovered Hunsaker's danger.

It is also insisted that the Short and Johnson cases above referred to have no application to a state of facts like those involved in this case, because in those cases there were a great number of persons employed in the railroad yards, whereas in this case few, if any, persons except the train crews, were reasonably to be expected on these tracks. Admitting this, we can perceive no sound reason why the rule should be different if the facts and circumstances under which the train is being moved are such as to cause a reasonably prudent person to anticipate the presence of even one person, in the performance of a duty, at a place of danger. It would be a dangerous rule indeed that would allow a switch crew operating one train to silently move up to where a second crew, engaged in similar work, is preparing to couple to a cut of cars, and suddenly kick another car violently against those which the second crew is inspecting, and avoid liability either on the ground that it was not a place at which a great number of persons were reasonably to be expected, or that the custom of handling cars in that yard allowed or permitted such action. L. & N. R. R. Co. v. Payne, 177 Ky. 463; Norfolk & Western Railway Co. v. Short's Admr., 171 Ky. 647; Ky. & Ind. Bridge Co. v. Sydnor, 119 Ky. 18; I. C. R. Co. v. Pierce, 175 Ky. 488. In the case of Southern Railway Company v. Otis's Admr., 78 S. W. 480, it was held that the backing of a freight train upon a siding against cars standing there, without warning by bell or whistle, where another crew was in the yard, was negligence, as to a brakeman between such cars, the court saying, "Under the proof in this case it was negligence on the part of those in charge of the Hampton train to back on to the siding without

giving any warning thereof by blowing the whistle or ringing the bell.''

Under the rule adopted in this state, where there is some evidence to support plaintiff's case, the trial court will submit it to the jury under proper instructions. Nor will the court take the case from the jury at the conclusion of all the evidence merely because the evidence on one side may be stronger than the evidence on the other. It will, when there is conflict in the evidence, leave the disputed questions of fact to the jury. The scintilla rule adopted in this jurisdiction makes it the duty of a trial court to submit the case to the jury if there is any evidence to sustain plaintiff's case. It has recently been held that if the appellee's evidence discloses any facts favorable to the appellant such facts may be considered if necessary to make out a case for appellant, but in no event can the evidence of appellee be considered, except to aid that of appellant upon a motion for peremptory instruction. Where the evidence is conflicting it is for the jury.

From a careful consideration of the record we are persuaded that the administratrix presented a case which entitled her to go to the jury, and the trial court erred in sustaining the motion for a directed verdict.

The judgment is therefore reversed for proceedings consistent with this opinion.