## Consolidation Coal Company v. Carter.

(Decided March 26, 1920.)

### Appeal from Letcher Circuit Court.

1.  Master and Servant—Protection of Employees—Rules—Waiver.—
    Employers of labor may adopt reasonable rules and regulations

for the safety and protection of their employees, and Kentucky Statutes, section 2738, expressly provides for the adoption of such rules by a coal operator, and when such rules are adopted an employee who has proper notice of them must observe their requirements, and if he fails to do so and is injured while violating them, the master will not be liable for the damages sustained, unless such requirements have been waived by some legal method.

2.   Master and Servant—Rule as to Operator of Electric Motor.— A rule requiring the operator of an electric motor used in a coal mine to see that it is kept in good repair, and to immediately repair it if it becomes defective, or to take it out of service and have it repaired if he is unable to do so, is a reasonable rule, and if known by the operator of the motor and he fails to observe it and is injured thereby, the master will not be liable.

3.   Master and Servant—Rules as to Operator of Electric Motor.— For a mechanic superior to a servant operating a motor, upon repairing it, to say to the operating servant with reference to the motor "It is ready, go ahead and finish the day, and I will put in a new set of resistance tonight" is, to say the least of it, not an assurance that the motor would remain "ready" or safe throughout the remainder of the day, and if it subsequently became out of repair it was the duty of the servant operating it to discontinue such operation and repair it, or to take it out of the mine for repair.

4.   Master and Servant—Negligence of Servant—Ordinary Care.—A servant can not relieve himself from the consequences of his own negligence by relying upon the master performing his duty, and if an injury is sustained by the servant through his negligence, he may not recover of the master, although the latter may have failed in some of his duties, unless the master saw or had knowledge of the perilous situation of the servant in time to prevent his injury by the exercise of ordinary care, in which case it would be the master's duty to exercise such care in order to prevent injury to the servant.

W. H. MAY, ALLIE W. YOUNG, EDWARD C. O'REAR, J. B. ADAMSON and W. G. DEARING for appellant.

J. J. MOORE, W. W. REYNOLDS, D. D. FIELDS and D. I. DAY for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

Plaintiff and appellee, Harrison Carter, filed this suit in the Letcher circuit court against defendant and appellant, the Consolidation Coal Company, its mine foreman, its electrician, and one of its brakemen on a coal car, seeking 'to recover $25,000.00 damages for the loss of one of his legs which he claimed was caused from injuries sustained by him through the negligence of de-

fendants. Before the trial the suit was dismissed or abandoned as to all of the defendants except the corporation and its electrician, Dan Bellamy.

The general allegations of negligence made in the petition were the failure of the corporate defendant to furnish plaintiff safe tools and appliances with which to do his work; that it negligently failed to employ a competent electrician, but kept in its employ an incompetent one, the defendant, Dan Bellamy; that it was likewise negligent in employing and keeping in its employ the brakeman on the coal train operated by plaintiff, and that it negligently obstructed the track upon which plaintiff was operating its train, and failed in its duty to notify him of such obstruction, by reason of all of which he was compelled to and did jump from his motor in emergency to avoid a collision and sustained the injuries resulting in the amputation of his leg.

The defendants in their answers denied each and all of the allegations of negligence and pleaded contributory negligence and assumed risk, and further relied on certain rules adopted by the corporate defendant for the guidance and government of its employees in the mine, which rules it was alleged were both reasonable and known to plaintiff, and that he failed to observe their requirements, and but for which there would have been no emergency necessitating plaintiff jumping from his motor to save himself from impending danger of a collision.

Appropriate pleadings made the issues, and a trial resulted in a verdict and judgment against the corporate defendant and its employe, Bellamy, for the sum of $8,000.00, and to reverse the judgment against it the coal company prosecutes this appeal.

Before taking up any of the errors urged against the propriety of the judgment, we will make a brief statement of the facts. The mine at which plaintiff was employed runs back into the mountain something near a mile. Entering the mine there are haulage tracks used for bringing out loaded cars, and other tracks for carrying empty cars into the mountain. At various points along those tracks are others branching off into different entries on either side. According to the testimony there are slight sags and corresponding grades in the main track, the grades ranging from one and one-half to three per cent. About 150 feet from the mouth of the mine

a branch haulage track connects with the main one, and it runs into a side entry known in the record as "the first left." From that point a distance of about 500 feet the main haulage track is straight and practically level, when it makes a slight curve to the right. At the point of connection of the first left haulage track with the main one a flagman was stationed, whose duty it was to signal those upon the main track, or those about to enter thereon from the branch track, so as to prevent collisions.

Plaintiff in this case was operating a motor hauling loaded cars out of the mine and empty cars back into it over the main tracks. He was driving a ten-ton motor of the best and most modern design. He had been operating it over the same tracks for more than twelve months, and had been working in that same mine as motorman for something like four years, possessing full and complete knowledge of all of the tracks in the mine as well as all grades and curves. Some time before three o'clock he had gathered a train of eighty-six cars from the various side entries back into the mine, and in starting to pull them out he discovered that the resistance in the controller of the motor had been burned-out up to the fourth point. This was explained by him and other witnesses to mean that the motor would not start until the controller was turned to the fourth point, when the force was of such strength as to produce a sudden or violent jerk. If the resistance was intact, 'the turning of the controller to the first point would gently start the motor and its load, the speed of which would be correspondingly increased by turning the controller to the successive higher points. As soon as this discovery was made plaintiff disconnected the motor from the load and went out of the mine, and he testified that Bellamy (the mine electrician) attempted to repair the controller. But his testimony as to such attempted repairing on that occasion is denied by Bellamy, also by the haulage foreman at the mine, and a number of other witnesses. Upon this point plaintiff was asked and answered as follows:

"Q. How long did he work there, Mr. Carter, with the motor? A. Five or ten minutes. Q. Did he say anything to you, then, after he quit? A. Said it was ready, go ahead and finish the day and he would put in a new set of resistance that night. Q. Said go ahead and he

would put in a new set that night? A. Said he would overhaul it that night and have it ready.''

Plaintiff then ran the motor back into the mine and connected it with the 86 cars which he had left and brought them out and gathered a load of empties and carried them back into the mine. After that he gathered together a train of thirty-six loaded cars and started out with them, when he discovered that the controller had again burned out so that it would not operate until turned to the fourth point, and he claims that in pulling the load up grade the starting of the car on the fourth point, which was the first one that would start it, caused such a jerk of the load as to release the brakes on the loaded cars and cause them to run against him with such force that he could not stop his train with the brakes and other appliances on the motor, and that as he came around the curve about 500 feet from the first left entry he discovered some cars on the main haulage track which had been pushed out of that entry, and when within about 150 feet of those cars, seeing that a collision was inevitable, he jumped from the motor and sustained the injuries of which he complains. He admits, as the proof also shows, that the brakes on the cars composing his train at the time were properly set, and that if they had remained so he could have stopped his train within 200 or 250 feet, and in time, after turning the curve, to prevent the collision. But those brakes, according to plaintiff's testimony, had been released by the jerking of the train caused by turning the controller to the fourth point, which result he admits that he knew would most likely occur. Thus it is seen that when pulling the train, plaintiff necessarily discovered the defects in the controller and could then have stopped it by turning off the power or declining to put it on, and then it was that he should have taken the motor out for repair, as we shall hereafter see.

The mine foreman at the time of the injury, who has since been discharged by the appellant, as well as plaintiff, testified that it was the duty of the flagman at the first left entry to go 500 feet to the curve, when cars were being pushed out from the first left entry, and there flag any train which might be coming out on the main haulage track. But all the other witnesses in the case (and there were a considerable number), including the flagman, contradict this. However, because of views here-

inafter expressed, we do not deem it necessary to discuss that issue any further.

Rule ten of the company, pleaded and relied on, and of which plaintiff admits that he had knowledge and admits his duty to obey it, among other things says:

"The motorman or locomotive engineer shall see that his haulage locomotive is in good, safe operating condition; that the same is provided with a gong, bell or whistle, and that the brake is working properly; and if he is unable to make any needed repairs, he shall promptly report that fact to the mine foreman or his assistant, and take the locomotive out of service until such repairs are made."

Rule eleven imposed a similar duty upon all employees operating any character of machinery connected with the mine, and rule seventeen required all employees "to use the utmost care to avoid injury to themselves and others, and to see that all tools, machinery, appliances and equipment with which they have to deal in the performance of their duties are kept in a safe condition of repair, and if they discover any thereof to be out of repair or unsafe, to repair or render same safe at once, and, if unable to do so, they shall report the defect to the mine foreman or his assistants."

Plaintiff testified that it was in observance of these rules that he disconnected the motor from the eighty-six cars and carried it out of the mine to be repaired by Bellamy, but he failed to take like action when he discovered a defect in the controller upon the last occasion, and which defect he claims caused his train to get from under his control, as hereinbefore explained, resulting in the collision, to avoid which he jumped and sustained his injuries. He states that the brakes on the motor were in perfect condition and were wholly disconnected from the controller, which had nothing to do with stopping the train, its only purpose being to propel it.

It is also testified by plaintiff that the controller worked perfectly after it was attempted to be repaired by Bellamy, and that he discovered that the first three points were burned out for the second time after he had started out of the mine with his last load of thirty-six cars, when he had that load about half way over a grade, but he did not attempt to stop the train and disconnect the motor but let the load down the grade and continued with the trip until he sustained his injuries.

The proof shows that the flagman at the first left haulage track signaled the plaintiff to stop as he rounded the curve five hundred feet away, which signal plaintiff admits that he saw, and he also admits that at the same time he discovered the cars which had been pushed out from the left entry on to the main track. Giving his reasons why he did not disconnect the motor on the last occasion and take it out for repairs, as required by the rules, plaintiff testified:

"Q. Why didn't you stop then and take the motor out? A. I was taking coal out and wanted to get out. Q. You wanted to get out whether the points were burned out or not? A. They seemed to be anxious to have the coal hauled, wanted to get it outside. Q. What was your duty in that event, when anything was wrong with the motor that needed repairing, under the service? A. My duty was to take it to have it fixed by the electrician."

It is thus admitted by plaintiff himself that he did not on the occasion complained of even attempt to comply with the reasonable rules of which he had knowledge, and with which he had been furnished a copy. But his counsel attempts to avoid this by insisting that Bellamy, when he had repaired the motor, assured plaintiff that it was safe, which assurance he relied on, and which fact excused him from complying with the rules. We can not agree with counsel in this position. In the first place there was no assurance of safety in what Bellamy is alleged to have said at the time. The only language attributed to him by plaintiff is that he "said it was ready, go ahead and finish the day," followed by a statement that the electrician would put in a new set of resistance that night. According to the testimony of plaintiff the controller was "ready" as Bellamy had assured him, for it made three trips after that, two into the mine and one out of it, and it worked all right. It evidently became out of repair for the second time while gathering up the thirty-six cars for the last load, and there is nothing in the remark attributable to Bellamy indicating an assurance of safety at the time it was made, much less that the controller would continue to remain safe, or "ready."

This court has held in numerous cases that an employer may adopt reasonable rules and regulations for the safety and protection of his employees, and that when they are adopted it is the duty of the employee who is

familiar with them to observe their requirements, and if he should fail to do so he can not recover of the employer damages for any injuries caused by such failure. One of the late cases dealing with this subject is Gatliff Coal Company v. Peace, 174 Ky. 572. A still later one in which the same doctrine is announced is Elkhorn Mining Corporation v. Vanhoose, 179 Ky. 529. Indeed our statute, sec. 2738b, permits the adoption of such rules by the operator of a coal mine, and sec. 2738c requires the employe in a mine to observe and obey them if he has the requisite knowledge of them.

Clearly the admitted facts of this case show an open violation by plaintiff of the reasonable rules adopted by his employer, which were known to him, and he has failed to manifest any legal excuse for such violation.

However, it is insisted by plaintiff that notwithstanding this, if the flagman had gone to the curve and by signal warned him of the obstruction on the track at the first left entry, he could have stopped his train in time to avoid the collision and save himself from injury. But this contention loses sight of plaintiff's prior negligence, even if it were conceded that he could have stopped his train if he had been given the signals insisted upon.

But for his negligence in continuing to operate his train with a defective motor, when it was his duty, under the rules, to take it out for repair, he would not have released the brakes on his train, and could have stopped it, after rounding the curve, in ample time to prevent the collision. A servant thus guilty of negligence may not be relieved of its consequences because, forsooth, the master may have neglected some of his duties toward the servant. Louisa Coal Co. v. Hammond's Admrx., 160 Ky. 271; Lumkin v. L. & N. R. R. Co., 144 Ky. 621; C., N. O. & T. P. Ry. Co. v. Swann's Admrx., 160 Ky. 478, and Bon Jellico Coal Co. v. Wilson, 167 Ky. 590. However, in such cases the master can not refuse to exercise ordinary care to save his servant from a perilous situation, even though it had been brought about by the servant's negligence; but in order to impose this duty on the master he must have knowledge of such perilous situation, and there is no testimony in this case that the flagman or any other person connected with the mine knew that the controller on plaintiff's motor was out of repair the second time, or that he was in a perilous situation.

Since, then, the plaintiff is not in a position to rely upon the failure of the flagman to signal him at the curve, and since there is no evidence of negligence, or of any assurances of safety on the part of Bellamy, the proximate cause of the accident was plaintiff's negligence in failing to observe the requirements of the rules. The cases, *supra,* and others which might be cited, do not permit a recovery in such cases, and the motion for a peremptory instruction should have been sustained.

This renders it unnecessary to consider other errors relied on, although some of the instructions do not conform to the law, but not desiring to unduly lengthen this opinion, we have concluded not to discuss them.

For the reasons stated the judgment is reversed with directions to grant a new trial, and for proceedings consistent with this opinion.