# Mitchell's Administratrix v. Chesapeake & Ohio Railway Company, et al.

(Decided May 29, 1928.)

## Appeal from Fayette Circuit Court.

1. Railroads.—Administratrix's action for railroad employee's death held governed by common-law rules of negligence, where such action was not against decedent's employer, but was against another railroad company, instead of being governed by the Federal Employers' Liability Act (45 USCA, secs. 51-59; Comp. St., secs. 8657-8665).

2. Negligence.—Contributory negligence on the part of person injured is a complete defense to the one injuring him, unless the facts make the case come within the last clear chance doctrine.

3. Railroads.—In action by administratrix of deceased railroad employee against another railroad company and an engineer thereof for decedent's death, submission of case on the last clear chance doctrine held proper, without elaboration of instruction as given.

4. Railroads.—In administratrix's action for death of railroad switchman, switchman's passing fouling point in the face of an adverse signal held contributory negligence, regardless of whether or not employees were in the habit of violating rule prohibiting such.

5. Railroads.—Even if railroad had acquiesced in employees' violation of rules, acquiescence could not be availed of in suit against another railroad company for employee's death, where third person relied on rules.

6. Railroads.—In action by administratrix of deceased railroad switchman for switchman's death caused by his engine being side-switched by the engine of another railroad company using the same yards, notice of railroad employees' practice of violating rules regarding signals of railroad for which deceased worked could not be imputed to engineer of railroad causing death, in absence of showing that such rules had previously been violated in the engineer's presence.

FRANKLIN, TALBOTT & CHAPMAN, W. E. DARRAGH, RICHARD J. COLBERT and W. E. SETTLE for appellant.

HUNT, NORTHCUTT & BUSH for appellees.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

An east-bound freight engine of the Chesapeake & Ohio Railway Company while passing through the yards of the Louisville & Nashville Railroad Company, at Lex-

ington, came in contact with and overturned an engine of
the latter company, which was running in the same direc-
tion on a parallel switch track, killing Ernest Mitchell,
the hostler in charge. In a suit for damages for the lat-
ter's death brought by the administratrix of his estate
against the Chesapeake & Ohio Railway Company and
Bert McClure, its engineer, the jury returned a verdict
for defendants, and plaintiff appeals.

. The principal ground urged for reversal is that the
court erred in refusing certain instructions offered by
the plaintiff, while the appellees insist they were entitled
to a peremptory instruction. · A consideration of these
questions requires a full statement of facts. The yards
of the Louisville & Nashville Railroad Company extend
for over a mile west of the point of collision and all train
movements therein are regulated by the rules of that
company. The Chesapeake & Ohio trains use two mains
running through the yards. Those going toward Lex-
ington run on the right or south main. At a point near
Jefferson street this main is intersected by a switch track
known as the "wall track." This track extends westerly
and gradually diverges from the south main. At a dis-
tance of 200 feet from the switch the space between the
tracks is sufficient for a clearance of cars. This space
widens to a clearance of 8 feet between the sides of the
cars, and thence the tracks continue parallel for more
than a quarter of a mile. The switch is equipped with a
target signal; 684 feet west of the target signal there is
a semaphore signal known as "93.2 signal"; 3,160 feet
further west there is a second semaphore called the
"home signal"; and, 3,260 feet further is a yard board
called the "distance signal." The semaphores are equip-
ped with an arm and lights. As applied to trains on the
main track, if the arm is at right angles and the light
shows red, enginemen are warned that the block imme-
diately in front is closed and that their train must be
stopped; if at three-quarters and the light shows yellow,
that the second block is occupied and that the train must
proceed with caution; if the arm is upright, and the light
green, that the track is clear for a distance of two blocks;
if the switch target shows green, that the main line is
open, but, if red, that the main line is closed and the
switch is open. The switch target and 93.2 signal are so
placed as to be seen by enginemen on both the main and
switch tracks and intended for the guidance of both, and
an open main signifies a closed switch.

Louisville & Nashville rule No. 104 introduced in evidence reads:

> "Enginemen must know that switches are in proper position before they foul or pull in or out of siding or other tracks."

And it is shown that "proper position" means that the switches are set and the main track is clear of obstructions.

Rule No. 622 reads:

> "They (enginemen) must take into consideration the fact that lives of passengers and trainmen, as well as the property of the company, is intrusted to their care and it is fully expected and required that they will not only attend to and obey all signals and instructions, but also that they will on all occasions be vigilant and cautious themselves not trusting alone to signals or rules for safety."

The Louisville & Nashville Railroad time table in effect at the time provided that trains should "approach Lexington . . . under control expecting to find the main track occupied."

On the 29th of June, McClure was running an extra train consisting of an engine and 20 freight cars en route from Louisville. At the time he arrived, about 6 a. m., it was dark. He was given a clear track at each of the semaphore signals, and the switch signal also signified that the main track was clear. Mitchell, a hostler in the yards, had made up a passenger train of 5 coaches and was taking it, together with an extra rear engine, to the passenger depot. His train came out on the wall track about one-fourth of a mile west of the switch, and, apparently, unaware of the fact that McClure's train was following on the main, a short distance in his rear, he approached the switch without stopping, and while running slowly his helper or switchman who was riding on the pilot, alighted and started in front to throw the switch, but never reached that point. McClure admits that he saw Mitchell's train, but says that he was relying on the signals and rules of the company and depending on Mitchell stopping his train before it fouled the main; and continued on his course. He claims to have been running at not exceeding 8 miles an hour and to have had his train under complete control. His engine overtook Mitchell's train and he knew he was gaining upon it, but

did not know the latter was passing the fouling point or that it had not stopped. When he was within 175 feet of the switch his engine "sideswiped" the other with the result stated.

On the other hand, there is evidence for plaintiff conducing to show that McClure's train was running at from 20 to 25 miles per hour at the time of the collision, and several persons who had worked in the yards testify that they had on different occasions assisted hostlers in making this switch, and that when no regular train was scheduled they would disregard the rules and make the switch without their engine coming to a stop before fouling the main track, and that this practice had been in vogue for many years, though they did not claim that it was known to the yardmaster or any official of the company. Defendant's witnesses deny any custom of that kind and say that, while there were sporadic violations of the rule, in each instance coming under their observation, the one so doing was disciplined, and McClure testifies that he knew nothing of such violations and was running his engine strictly in accordance with the printed rules and relying upon them. The principal instructions read:

No. 1. "It was the duty of defendant McClure in charge of the engine of the Chesapeake & Ohio Railway Company in approaching Lexington to keep it under control expecting to find the main track occupied, and to use ordinary care to avoid collision with other engines or trains, on or approaching or near to the main track, and if you believe from the evidence that said McClure failed to discharge any one or more of the above-mentioned duties, and as the direct and proximate result of such failure, if any, the said engine collided with the engine of the Louisville & Nashville Railroad Company, operated by the decedent Mitchell, and caused it to turn over and kill said Mitchell, the jury will find for the plaintiff against the defendant McClure and the Chesapeake & Ohio Railroad Company, but, unless you do so believe, you should find for the defendants McClure and the Chesapeake & Ohio Railroad Company."

No. 2. "It was the duty of plaintiff's intestate, Mitchell, in operating his engine to know that the switches were in proper position before he fouled the

other track, and it was also the duty of said Mitchell to use ordinary care for his own safety, and if the jury believed from the evidence that Mitchell failed to exercise any one or more of the above-mentioned duties, and that his failure, if any, helped to cause or bring about the accident which resulted in his death and but for such failure the accident would not have occurred, then the jury will find for the defendants McClure and the Chesapeake & Ohio Railroad Company, even though you may believe from the evidence that defendants were guilty of negligence as set out in instruction No. 1, unless the jury further believe from the evidence that McClure who was in charge of the engine of the Chesapeake & Ohio Railway Company saw, or by the exercise of ordinary care could have seen, the danger or peril of decedent, Mitchell, in time to have avoided the collision with the engine of the Louisville & Nashville Railroad Company by the exercise of ordinary care and with the use of the means at his command and failed to do so, in which event the jury should find for the plaintiff.''

As this action is not brought against the decedent's employer under the Federal Employers' Liability Act (45 U. S. C. A., sections 51-59; Comp. Stats., sections 8657-8665), but against third parties, it is governed by the common-law rules of negligence as applied in this jurisdiction.   Under our rule contributory negligence upon the part of the injured person is a complete defense, unless the facts authorize an instruction on the last clear chance doctrine, and with some hesitation we have reached the conclusion that it was proper to submit this issue, which, it will be observed, was done by a qualification of the second instruction.   Hence the court did not err in refusing to give a peremptory instruction for appellee, nor in refusing to give a more elaborate instruction offered by plaintiff on the last clear chance theory, in which it is urged that the issue of proximate cause was more fully presented.

Nor did the court err, as is urged, in not giving an instruction based on the habitual violation of the Louisville & Nashville rule No. 104.   We have seen that the movement of trains in the yard was controlled by semaphore signals, and that a green semaphore signal signified

an open main track and a closed switch. Parallel trains approaching such signals were thus advised of track conditions. It was a hazardous thing for the switchman to pass the fouling point in the face of such signal. He was bound to know that an open track was an invitation to any main line train that might be approaching, and that, if he entered the danger zone, it was at his peril. Even in the absence of a rule this would constitute contributory negligence, though, perhaps, if the company sanctioned the custom of making switches in this way, it might be estopped from relying on such conduct as contributory negligence. Hunsaker v. Ashland C. & I. Ry. Co., 181 Ky. 598, 205 S. W. 612.

Under the circumstances and conditions of this yard it was imperative for the company to adopt and enforce reasonable rules for the guidance of the trainmen and for the protection of both trainmen and the traveling public, which it did by rule No. 104, which we quote again:

> "Enginemen must know that switches are in proper position before they foul or pull in or out of sidings or other tracks."

This rule reasonably and practicably meets the situation, and, as to such, we have said:

> "It has therefore come to pass that absolute obedience to the rules established for the movement of trains is of the first importance. It is indispensable to the safety of life and protection of property that carriers engaged in the hazardous business of transportation by modern methods should devise and publish these rules, not only for the safety of the public, but for the protection of the employees." C. & O. R. R. Co. v. Barnes, 132 Ky. 728, 117 S. W. 261.

And in another case:

> "It is indispensable to the safety of the traveling public that rules like the ones we have been considering should be literally obeyed by trainmen, and when a trainman whose duty it is to obey these rules is injured as a result of their violation, it is well settled that he cannot recover damages from the company." L. & N. R. R. v. Moran, 148 Ky. 418, 146 S. W. 1131, citing Consolidation Co. v. Carter, 187 Ky. 570, 219 S. W. 1074; Sinclair v. I. C. R. R. Co., 100 S. W. 236, 30 Ky. Law Rep. 1040; L. & N. R. R. v. Scan-

lon, 60 S. W. 643, 22 Ky. Law Rep. 1400; L. & N. v.
Sewell, 142 Ky. 171, 134 S. W. Rep. 162; C., N. O. &
T. P. Ry. Co. v. Lovell, 141 Ky. 249, 132 S. W. 569,
47 L. R. A. (N. S.) 909; C., N. O. & T. P. Ry. Co. v.
Silvers (Ky.) 126 S. W. 121.   To the same effect see
L. & I. R. R. Co. v. Kraft, 156 Ky. 66, 160 S. W. 803,
L. R. A. 1916E, 263; L. & N. R. R. Co. v. Hiltner, 60
S. W. 2, 22 Ky. Law Rep. 1141; Elkhorn Coal Cor-
poration v. Guttadora, 190 Ky. 770, 228 S. W. 420; L.
& N. R. R. v. Smith's Adm'r, 186 Ky. 35, 216 S. W.
1063.

It is true that in a number of cases between master
and servant where the evidence showed that rules
adopted for the guidance of employees were habitually
violated with the knowledge and acquiescence of the mas-
ter, or for such a length of time as would imply knowl-
edge and acquiescence upon his part, it has been held to
be a question for the jury to determine whether the rule
had been thus ignored, and, if so, whether or not the serv-
ant violating such rules in the instant case was guilty of
contributory negligence.  C., N. O. & T. P. Ry. Co. v.
Lovell, supra; L. & N. R. R. Co. v. Foley, 94 Ky. 220, 21 S.
W. 866, 15 Ky. Law Rep. 17; L. & N. R. R. Co. v. Bocock,
107 Ky. 223, 51 S. W. 580, 21 Ky. Law Rep. 383, 53 S.
W. 262, 21 Ky. Law Rep. 896; Alexander v. L. & N. R. R.
Co., 83 Ky. 589; Guttadora Case, supra; Gatliff Coal Co.
v. Peace, 174 Ky. 573, 192 S. W. 651.   The rationale of
this doctrine is well stated in monographic note to Little
Rock & H. R. R. Co. v. Barry, 43 L. R. A. 370.

"The correct theory undoubtedly is either that
the employer's intention to abolish a rule is de-
duced from his omission to enforce it, or that this
omission amounts to a kind of estoppel in pais, which
precludes him from relying on the defense of contri-
butory negligence so far as it might be predicated
from the servant's disobedience to orders."

The evidence in this case is not sufficient to indicate
an intention of the company to abolish a rule so essential
to the proper control of its signal system.   And it is ques-
tionable whether the evidence showed an habitual viola-
tion of the rule with the knowledge or acquiescence of the
superior yard officers.   But if we assume that there was
a scintilla of evidence on this issue which would authorize
its submission to the jury in a suit between master and
servant on the theory that having encouraged such con-

duct by knowingly suffering it to be generally followed, the master was estopped to rely upon a disobedience of the rule as contributory negligence, nevertheless, this would not apply to unsuspecting third parties. The liability of both defendants would then depend upon the knowledge and conduct of Bert McClure. He claims to have relied implicitly on the printed rules of the Louisville & Nashville Railroad and to have run his train in accordance therewith, and denies all knowledge of any former violation of the rules. In this he is not contradicted, not even inferentially. True, he admits having run trains through this yard for several years, but it is not claimed by plaintiff's witnesses that the rules were ever violated at any other time when a train was running through the yard, hence notice of this practice is not imputed to McClure, and if, in his absence and without his knowledge, the Louisville & Nashville Railroad officials had theretofore permitted the rules to be violated by switchmen, such conduct does not estop the defendants in this action from relying on Ernest Mitchell's disobedience to the rules; so that in no event was the plaintiff entitled to an instruction on this point.

Wherefore, perceiving no error, the judgment is affirmed.